Opinion by Judge SILVERMAN; Partial Dissent by Judge REINHARDT.
OPINION
SILVERMAN, Circuit Judge:
Defendant Lezmond Mitchell, then 20 years old, plottéd with three others to carjack a vehicle for use in an armed robbery of a trading post located on the Navajo reservation in Arizona. On October 28, 2001, Mitchell and his 16-year-old accomplice, Johnny Orsinger, abducted 63-year-old Alyce Slim and her nine-year old granddaughter. Slim and the child were traveling to New Mexico in Slim’s GMC pickup truck. Somewhere near Sawmill, Arizona, Mitchell and Orsinger killed Slim by stabbing her 33 times. Her dead body was pulled into the rear of the truck, where the child was made to sit beside it. Mitchell then drove the truck into the nearby mountains.
Thirty or forty miles later, Slim’s body' was dragged out of the truck. • Mitchell told the little girl to get out and “lay down and die.” Mitchell then cut her throat twice. When she did not die, Mitchell and Orsinger each dropped large rocks on her head. Twenty-pound rocks bearing the child’s blood were later found at the scene.
Mitchell and Orsinger left the murder scene, but later returned to hide evidence. While Mitchell dug a hole in the ground, Orsinger severed the heads and hands of both victims in an effort to prevent their identification. The dismembered parts were buried in the hole; the torsos were pulled into the woods. Mitchell and Or-singer later burned the victims’ clothing and other personal effects. Mitchell washed the knives with alcohol to remove any blood.
Three days later, on October 31, 2001, Mitchell and two accomplices (Jason Kinli-cheenie and Jakegory Nakai) drove to the Red Rock Trading Post in the GMC pickup truck stolen from Slim. The three men wore masks when they entered the store. Mitchell carried a 12-gauge shotgun. Na-kai had a .22 caliber rifle. One of the gunmen struck the store manager in the head with his gun. When another employee said that she did not know the combination to the safe, one of the robbers said, “If you lie to me or you don’t cooperate with us, we are going to kill you.” Ultimately, the robbers made off with $5,530 from the safe and cash registers, and the store manager’s purse.
The robbers drove the stolen GMC pickup truck back to Kinlicheenie’s car. Kinli-cheenie followed Mitchell in the truck to an area near Wheatfield, Arizona, where Mitchell set the truck on fire with kerosene stolen from the trading post. They then went to Jakegory and, Gregory Na-kai’s house and split up the money.
Mitchell was convicted in federal court of eleven counts in all, including two counts of first-degree murder, carjacking resulting in death, and multiple counts of robbery. The two murders were not punishable by death because they were committed on the Navajo reservation. Federal jurisdiction over those counts is based on the Major Crimes Act, 18 U.S.C. § 1153, and the Navajo Nation did not “opt in” to the death penalty under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591. However, federal jurisdiction over carjacking resulting in death does not derive from the Major Crimes Act; the federal nexus is interstate commerce. It does not matter that the crime occurred in Indian country, and therefore, the opt-in provision of the Federal Death Penalty Act does not apply. In other words, carjacking resulting in death car *884 ries the death penalty regardless of where it was committed. See William C. Canby, Jr., American Indian Law in a Nutshell 185-87 (6th ed.2015).
Mitchell was sentenced to life imprisonment for the two murder counts, long consecutive prison sentences for the robbery and related counts, and death for carjacking resulting in death. His convictions and sentences were upheld on direct appeal. United States v. Mitchell, 502 F.3d 931 (9th Cir.2007). The United States Supreme Court denied a petition for a writ of certiorari. Mitchell v. United States, 553 U.S. 1094, 128 S.Ct. 2902, 171 L.Ed.2d 843 (2008).
Which brings us to the subject of this appeal. After exhausting his direct appeal, Mitchell brought a motion under 28 U.S.C. § 2255 alleging that his team of defense lawyers rendered ineffective assistance of counsel. The team was made up of two veteran deputy federal public defenders and a private lawyer highly experienced in capital cases appointed as “learned counsel.” The § 2255 motion raised various issues, but it boiled down to these claims: (1) Counsel was ineffective in failing to assert an intoxication defense at the guilt phase of the trial; and (2) Counsel was ineffective at the penalty phase for inadequately investigating, and for choosing not to present evidence of, Mitchell’s mental health, history of substance abuse, and troubled upbringing. The trial court denied the motion in a lengthy and thorough written order.
We agree with the district court that counsel did not fall below professional standards in either their investigation of a possible intoxication defense or their decision to pursue a different defense strategy. They did indeed investigate whether Mitchell was intoxicated at the time of the offenses. Mitchell adamantly denied to them that he was. Even so, they looked for evidence to contradict their client, such as liquor bottles left at the crime scene, but they couldn’t find any. The only other living witness to the murders of Slim and her granddaughter was Johnny Orsinger, and he wasn’t talking; he was under indictment himself and invoked his privilege against self-incrimination. Even assuming for the sake of argument that there was some evidence of alcohol involvement, the planning and premeditation of the vehicle theft as preparation for the pre-planned trading post robbery are inconsistent with a claim that Mitchell was too drunk to know what he was doing. And after Mitchell was apprehended, he led authorities to the desolate crime scene, further evidence that he was not so intoxicated that he could not accurately recall events or appreciate where he was and what he was doing.
We agree with the district court that counsel conducted an adequate investigation and then made a reasonable strategic decision that it would be self-defeating to try to sell a jury on an intoxication defense on these facts, and that, instead, they would be better off trying to portray Or-singer as the main malefactor. Strategic decisions such as these are entitled to deference and do not support a claim of ineffective assistance.
With respect to the penalty phase of the case, we also agree with the district court that Mitchell’s legal team made a more-than-adequate investigation of possible mitigation, including his mental health and social history. Early in the case, defense counsel had Mitchell examined by a psychologist, Susan Parrish, Ph.D. Dr. Parrish diagnosed Mitchell with antisocial personality disorder and cautioned counsel against calling her as a witness. Mitchell’s lawyers also had him examined by a team of doctors led by psychiatrist Barry Mor-enz, M.D., at the University of Arizona medical school Mitchell also was examined *885 by neuropsychologist Anne Henning, Ph. D., and by neurologist Ronnie Bergen, M.D. Mitchell underwent brain imaging read by James Guay, M.D. and an EEG read by Colin Bamford, M.D. He also had lab work done. Dr. Morenz then produced a 19-page, single-spaced report, in which he diagnosed Mitchell with, among other things, depressive disorder, cognitive disorder, polysubstance abuse, history of head injuries, and antisocial personality disorder. He also noted a “mild deficit” in executive functioning likely due to emotional factors, not brain trauma. No further testing or consultation was suggested.
Mitchell’s lawyers also hired an experienced “mitigation specialist,” Vera Ocken-fels, who produced a 42-page, single-spaced “social history” of Mitchell’s life. The report is thorough in the 'extreme,containing sections with titles like “Conception, Pregnancy and Birth,” and recounts not only Mitchell’s life story and social history, but that of his parents and grandparents as well.
Only after reviewing all of this data, making numerous trips to the reservation,conducting many interviews themselves, and visiting with Mitchell himself, did defense counsel choose their mitigation strategy: Forego presenting evidence of Mitchell’s drug use, mental health, and physical abuse and instead make the case that Mitchell had redeeming qualities that made his life worth saving, notwithstanding a rough start in life. Counsel presented evidence that Mitchell was unloved and rejected by his mother, struggled with his mixed Navajo and Anglo heritage, and felt caught between two .different cultures. Despite these obstacles, Mitchell showed highly positive qualities. He was a good student, a speaker at his high school graduation, and a good athlete, liked by his teachers, and loved by others. In all, the defense presented nine witnesses in the penalty phase of the trial.
The defense also presented evidence that Mitchell had never before been convicted of a crime, that this offense was an aberrant act for him, and that Orsinger was the instigator and actual killer. Defense counsel also showed that the death penalty for Mitchell would create a terrible sentencing disparity. Besides this crime, Orsinger and Gregory Nakai had killed two other individuals during an earlier carjacking. Orsinger had pistol whipped the victims and shot one victim in the head. Nakai had shot the other victim five times. Yet, neither Nakai nor Orsinger, who was a juvenile, would face the death penalty.
In addition, counsel presented evidence that the death penalty offends Navajo values, and the Navajo Nation did not want the United States Attorney to seek the. death penalty in this case.
Mitchell’s lawyers had to walk a very careful line to avoid opening the door to highly damaging evidence contained in the medical report, such as Mitchell’s diagnosis as a sociopath, his history of swinging dogs and cats by their tails and then throwing them off of bridges just for fun, and his having told Dr. Morenz that he and his accomplice had to kill the little girl to avoid being caught.
We agree with the district court that Mitchell’s defense team conducted a professional-caliber investigation and then, facing unenviable choices, made a reasonable strategic decision to defend the penalty phase of the trial the way it did. Strategic decisions such as this do not support a claim of ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Mickey v. Ayers, 606 F.3d 1223, 1238-39 (9th Cir.2010).
We affirm.
*886 I. The Record.
The facts of the crimes are summarized above and set forth in greater detail in the opinion in the direct appeal, United States v. Mitchell, supra.
The facts bearing on Mitchell’s present claims of ineffective assistance of counsel were submitted to the district court in numerous declarations, other documents, and in the lengthy depositions of Mitchell’s three trial lawyers taken by Mitchell’s habeas counsel. The material facts — that is, what Mitchell’s lawyers did, what they didn’t do, and why — are not disputed. What is disputed is whether counsels’ investigation and strategic decisions were reasonable as a matter of law. In the analysis that follows, we examine whether counsels’ investigation and strategy fell below an objective standard of reasonableness. Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052. Because the material facts are not in dispute — they either entitle Mitchell to relief or they don’t — the district court did not abuse its discretion in declining to hold an evidentiary hearing. United States v. Howard, 381 F.3d 873, 877-79 (9th Cir.2004).
II. Defense counsel adequately investigated the possibility of an intoxication defense and reasonably decided against asserting it.
Mitchell argues that his three lawyers — Deputy Federal Public Defenders Jeffrey Williams and Gregory Bartolomei, and private lawyer John Sears — failed to adequately investigate the possibility of an intoxication defense for use in the guilt-phase of the trial. The facts show otherwise.
Sears, who had practiced for 28 years and was experienced in criminal defense, was appointed as learned counsel[1] and took the lead on the guilt phase. Williams had 15 years of criminal defense experience, had already tried two capital cases and had worked on several other capital cases when he was appointed in this case. Bartolomei had practiced for 23 years, mostly as a criminal defense attorney, and had previously attended the Death Penalty College at the Santa Clara University law school.[2] The Federal Public Defender’s Office in Arizona is particularly well-experienced in defending Indian reservation chses.
Defense counsel were well aware of Mitchell’s history of substance abuse. They knew about it from various sources, including the report of Vera Ockenfels, the lawyer whom they hired who specializes in developing mitigating evidence. They confronted Mitchell with his statements to FBI agents about his substance abuse, but Mitchell “adamantly” denied that he was under the influence of any substance at the time of the crimes. Unwilling to take Mitchell’s word for it, his lawyers dutifully pored over photographs of the crime scene and visited the scene of the crimes themselves looking for any evidence of drinking or drugs. Liquor bottles left behind? Drug paraphernalia? They found nothing.
Mitchell’s lawyers also knew that Johnny Orsinger, the only other living person present when the crimes were committed, used drugs and alcohol. Mitchell’s lawyers sought to interview him, but Orsinger’s lawyer wouldn’t allow it. When Mitchell’s lawyers subsequently subpoenaed Orsinger, he repeatedly asserted his Fifth *887 Amendment privilege and refused to answer questions.
In short, counsel investigated the possibility of asserting an intoxication defense, but could find no admissible evidence that Mitchell was intoxicated at the time of the carjacking and murders.[3] To the contrary, Mitchell himself denied being intoxicated, and the manner in which the crimes were committed was inconsistent with a supposed inability to form intent due to intoxication, even if he had been drinking: the carjacking was premeditated and committed in preparation for the trading post robbery; the grandmother and little girl were killed and then dismembered to get rid of witnesses and dispose of evidence; and, with impeccable recall, Mitchell gave the FBI a highly detailed account of the crime and his complicity in it. Mitchell’s ability to lead investigators back to the desolate scene of the crime is further indication that Mitchell was not unaware of where he was or what he was doing when the crimes were committed.
Mitchell’s lawyers did not ignore the possibility of an intoxication defense. Just the opposite. They investigated it, they discussed it with Mitchell, they attempted to interview Orsinger, they looked for extrinsic evidence, they debated it among themselves, and only then, given the lack of evidence of intoxication and the strong circumstantial evidence to the contrary, did they decide that they would be unlikely to convince a jury to accept voluntary intoxication as a defense to these premeditated crimes. Lawyers who make professional decisions of this type, after a reasonable investigation such as occurred in this case, are “strongly presumed” to have rendered adequate assistance. Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) (internal quotation marks omitted); Edwards v. Ayers, 542 F.3d 759, 772-73 (9th Cir.2008) (counsel acts reasonably by not asserting a de-' fense that is not supported by sufficient admissible evidence). That is the situation here. The district court correctly denied Mitchell’s § 2255 motion with regard to counsels’ decision to forego an intoxication defense at the guilt phase of the trial.
III. Counsel conducted a thorough investigation of mitigating evidence — social, medical, and psychiatric — only after which did they make a reasonable strategic decision about what evidence to present and what to fore-go.
Given the strong evidence of Mitchell’s guilt, including his well-corroborated confession, and the lack of any realistic defense, Mitchell’s lawyers knew that the rubber-would-meet-the-road in the penalty phase of the trial, so they began to prepare for that part of the case immediately.
The defense team consistently met throughout the case to discuss the possi: ble theories of mitigation. Deputy Federal Public Defender Greg Bartolomei was principally in charge of this aspect of the case. Early on, Bartolomei spoke to Mitchell in detail about the case, his childhood, interests, parents, grandparents, medical history, drug history, and schooling. The defense also' hired Vera Ocken-fels, a well-known and experienced “mitigation specialist,” to marshal mitigating evidence. Ockenfels gathered all available records and interviewed Mitchell’s mother, grandparents, uncle, other extended family members, friends, acquaintances, football coach, teachers, and other school *888 employees. She located and attempted to interview Mitchell’s father.[4] Bartolomei traveled to the Navajo reservation with Ockenfels to interview Mitchell’s mother, grandparents, uncle, friends, football coach and other employees at Mitchell’s school. Deputy Federal Public Defender Jeff Williams separately interviewed Mitchell’s mother, Sherry. Sherry mostly talked about herself, and she walked out of the interview with Williams. She had previously told the FBI that Mitchell belonged in prison.
Six months before the penalty trial, Ock-enfels turned in her 42-page, single-spaced “social history report,” consisting of a complete, thoroughly documented biography of Mitchell, his mother, and his maternal grandparents. The report noted Mitchell’s struggle with his mixed race, large size, and lack of fluency in the Navajo language and culture; verbal and physical abuse of Mitchell during his childhood; and Mitchell’s extensive history of alcohol and drug use. The report also documented Mitchell’s own violent history: he joined a gang in third grade, formed his own gang by eighth grade, was suspended and expelled from school for fighting, and abused dogs and cats for entertainment. Ockenfels also obtained psychological records from Mitchell’s school, and interviewed Dr. Edward Fields, a psychologist for the Chinle School District, who was Mitchell’s therapist while he was in high school. The defense team personally met with Ocken-fels and reviewed her report.
Defense counsel also hired several mental health professionals. Counsel initially hired Susan Parrish, Ph.D., a psychologist, who diagnosed Mitchell as a sociopath and warned counsel against calling her to .testify. Following up on Ockenfels’s hunch that Mitchell may have blacked out or had a psychotic episode at the time of the crimes, defense counsel hired Barry Mor-enz, M.D., and his team of experts at the University of Arizona medical school to look for medical or psychiatric evidence that might be helpful. Defense counsel provided extensive background information to Dr. Morenz, including all of the prosecution’s evidence in the case. In addition, Dr. Morenz conducted and documented in-depth background interviews of his own with Mitchell, defense investigator Karl Brandenberger, and mitigation specialist Ockenfels.
With Dr. Morenz at the helm, Mitchell was examined and evaluated by a psychiatrist, a neuropsychologist, and a neurologist at the University of Arizona and underwent numerous tests and studies. The neurological exams, EEG, MRI, and laboratory results were normal. Testing established that Mitchell had average intelligence. When all the data was in, Dr. Morenz diagnosed Mitchell with: (1) depressive disorder not otherwise specified based on Mitchell’s statements that he felt despondent and hopeless; (2) polysub-stance abuse based on abuse of alcohol, marijuana, cocaine, ecstasy, and other drugs on a regular basis for a number of years; (3) a cognitive disorder not otherwise specified based on executive functioning deficits that were mild and of uncertain etiology and clinical significance; and (4) an antisocial personality disorder based on Mitchell’s history of childhood aggression, deceitfulness, frequent rule violation, cruelty to animals that would have warranted a conduct disorder diagnosis as an adolescent, a continued disregard for the rights of others, and a failure to show remorse for his behavior.
*889 As already noted, neuropsychological testing by Dr. Morenz’s team revealed “some mild deficits in executive functioning, impulsiveness and poor planning,” that “were more likely related to emotional factors than traumatic brain injury.” Mitchell now faults his lawyers for not pursuing that finding further, but it is significant to note that Dr. Morenz did not recommend further testing, if indeed there is any further testing that could have been done, relating to these “mild deficits” of likely “emotional” origin.
Defense counsel reviewed Dr. Morenz’s comprehensive report, discussed it with him, and ultimately decided not to present mental health evidence for fear that it would open the door to even more damaging evidence and do more harm than good. Defense counsel knew that they would have to turn the report over to the prosecution if Dr. Morenz testified. They concluded that the report would open the door to “ugly” damaging facts that would have a “negative and adverse” effect on the jury. Specifically, the report documented Mitchell’s diagnosis of antisocial personality disorder, history of violence, cruelty to animals, gang involvement, that his gang sold drugs to children, and that Mitchell had been involved in the shooting of an innocent girl during a dispute with a rival gang-over marijuana. Worse, Mitchell told Dr. Morenz detailed facts regarding the crime that he had not already admitted to the police or FBI, including the fact that he decided to kill the child to prevent her from identifying him. Mitchell also told Dr. Morenz of his desire to kill the person who had ratted out their group to the police.
Defense counsel concluded that introducing evidence of Mitchell’s mental health was fraught with danger, given the door that would be opened to extremely damaging evidence, and could negate the positive things that they had to say about him. Counsel also decided that it would be wise to stay away from Mitchell’s history of alcohol and drug abuse. In their professional opinion, jurors would be turned off by such evidence and view it as a poor excuse for extremely horrendous crimes. And, again, such evidence would contradict the more positive' picture they wanted to paint.
In the § 2255 proceedings, Mitchell’s new lawyers produced a new declaration from Dr. Morenz, dated in 2009. In this declaration, Dr. Morenz states that he could have testified that Mitchell “might” have been under the influence of drugs or alcohol at the time of the crime and that his perception of reality “might” have been altered. This new declaration changes nothing. Besides being equivocal, the problem remained that if Dr. Morenz had testified to such a possibility, the door would have been opened to a whole panoply of contrary evidence of which Dr. Mor-enz was aware, such as Mitchell telling Dr. Morenz why he and Orsinger killed the little girl. In his report, Dr. Morenz quoted Mitchell as telling him, “I’m running this equation in my head that 9 times out of 10 if we let the little girl go the cops will be after us.”
In his deposition, defense lawyer John Sears testified that the defense team had used juror questionnaires to determine prospective jurors’ attitudes towards potential issues, including their reactions to Native American crimes, vulnerable victims, and whether the jurors were open to “excuses,” such as mental problems or substance abuse. The defense used a series of hypothetical questions to assess potential jurors’ reactions and then factored those reactions into Mitchell’s defense. The questionnaire responses by prospective jurors confirmed counsels’ belief that the jury would view both mental health *890 and substance abuse mitigation defenses in a negative way.
Defense counsel made a reasonable professional judgment, after a careful investigation, that the introduction of mental health and drug abuse evidence would be more damaging than helpful. We do not second-guess strategic decisions such as this. Mickey, 606 F.3d at 1238-39.
So, if no mental health or substance abuse mitigation, then what?
Bartolomei, Williams, and Sears decided that the best way to save Mitchell from the death penalty was a mitigation strategy consisting of three main themes: First, Mitchell’s life should be spared because he is not a worthless human being — that is, he is a person with significant redeeming qualities, who has overcome difficult challenges in his life, facts that weigh against simply discarding him like so much trash. Defense counsel presented the testimony of Dr. Robert Roessel, the executive director of Mitchell’s high school, who testified that Mitchell had been an excellent student, respectful, an outstanding athlete, a member of the student council, and a speaker at graduation. Dr. Roessel testified that Mitchell was kind, and did well in school despite a difficult upbringing, a disinterested mother who never loved him, a school system that failed to nurture him, and confusion over his mixed Navajo and Anglo heritage. Because Mitchell’s grandparents were also educators at the school, Dr. Roessel knew Mitchell’s family. Dr. Roessel testified that Mitchell had his problems, but had positive qualities, too, and had the potential to teach others in prison. Dr. Roessel asked the jury to spare Mitchell’s life.
The defense also presented the testimony of Ruth Roessel, Dr. Roessel’s wife and a school teacher. Mrs. Roessel testified that she met Mitchell when he moved in with his grandfather in Round Rock and knew Mitchell at school. Mrs. Roessel also knew Mitchell’s family. She testified that Mitchell was raised in a “cold home,” but that he was always respectful to her and called her “shima,” which means “my mother.”
Mitchell’s uncle, Ausca[5] Kee Charles Mitchell, testified that he worked at Mitchell’s schools. Mitchell spent a lot of time with Uncle Ausca and his family, and was always respectful. Uncle Ausca and his family attended Mitchell’s high school graduation ceremony. The defense introduced into evidence pictures of Mitchell with family on graduation day, Christmas, and other family gatherings. Uncle Ausca testified that Mitchell was a fast learner who had computer and vocational skills. He was a good kid until he met Johnny. Orsinger. Although Uncle Ausca did not know Orsinger, he knew that Orsinger was dealing drugs at the school dorms. The teachers thought highly of Mitchell, but were “scared to death of Orsinger.”
Marty William Conrad, the athletic director, social studies teacher and head football coach at Mitchell’s high school, testified that Mitchell was a good football player, a leader on the team, interacted well with the players, and was well-behaved. Mr. Conrad testified that Mitchell was good enough to play college football, and he thought Mitchell was going to community college to play football. The defense introduced into evidence a picture of Mitchell with the football team.
John F. Fontes, Jr., the assistant principal at Mitchell’s high school, testified that he saw Mitchell daily at school. Mitchell was an excellent student, a good football player, and involved with student government during his senior year. Mitchell was never physically violent. The only disci *891 plinary incident was a brief suspension for possessing a personal amount of marijuana. Mr. Fontes testified that Mitchell knew right from wrong, but tended to withdraw or not respond if he was fearful. Although Mr. Fontes had met Mitchell’s uncle and grandfather, he had never met Mitchell’s mother Sherry. The one time he called Sherry, she called his supervisor and advised the school not to contact her because she wanted nothing to do with Mitchell. Mr. Fontes testified that Mitchell was smart and had the potential to lead others in a positive way in a structured environment. He believed that Mitchell’s life should be spared.
Mitchell’s friend, Lorenzo Reed, Jr., testified that he had known Mitchell since third grade,- and that they had attended high school together. Mitchell’s mother had abandoned him, and it was painful for Mitchell. Mitchell moved in with Mr. Reed’s family after he turned 18. Mitchell became part of the family, was respectful, and helped with the chores. Mitchell also was respectful while living with Mr. Reed’s uncle in Phoenix. Mitchell briefly moved to California, but came back for. Mr. Reed’s high school graduation. Mr. Reed also asked the jury to spare Mitchell’s life.
Sonja Hasley, Mitchell’s high school English teacher, testified that Mitchell was an excellent student who helped her and other students in class. Mitchell was gentle, quiet, and respectful. When confronted with a violent situation, Mitchell wouldn’t participate either verbally or physically. Mitchell’s mother, Sherry, refused to come to the school, and his grandparents never came to the school to discuss Mitchell’s progress, either. Ms. Hasley testified that Mitchell’s family acted contrary to the Navajo culture, in which mothers and grandmothers are very important. Ms. Hasley stated that Mitchell had the potential to be a good teacher in prison.
Tammy Sebahe, a member of Mr. Reed’s family, testified that Mitchell lived with them, became part of their family, and still remained a part of their family. She had been visiting Mitchell for the previous year at jail, where they spoke over a phone with a glass wall separating them.
The defense also played the videotaped testimony of Mitchell’s grandmother, Bobbi. Bobbi mostly talked about herself, a point that the defense would mention in closing argument as illustrative of the dysfunction in the family.
In closing argument, Sears argued that these facts showed that Mitchell had redeeming qualities despite his lack of family support, responded well to structure, and if sentenced to life without parole, he would adapt to prison and could have a positive impact on other inmates.
The second theme of the penalty phase strategy was that Johnny Orsinger was the mastermind behind these crimes, and that Mitchell was a follower. The defense introduced evidence that Orsinger and Gregory Nakai were not only the brains behind these crimes, but had committed a similar carjacking and multiple murder two months earlier. In fact, Orsinger had bragged that he had murdered the victims in this case — and yet, Orsinger and Nakai would be spared the death penalty. Or-singer was immune because he was 16, but the FBI agent could not explain why Na-kai, who was the same age as Mitchell and had also committed murder during a carjacking, had not been sentenced to death. Mitchell’s lawyers hammered home the point that it would create an intolerable and irrational disparity for the two main culprits to get life sentences, while Mitchell, the follower, was sentenced to death.
The third theme was that the Navajo Nation opposes the death penalty, and did not want Mitchell sentenced to death. Mitchell’s defense team even put before *892 the jury a letter from the Navajo Nation to the United States Attorney — the prosecuting agency in this very case — stating its opposition to capital punishment in general, and in this case in particular.
The strategy chosen by Bartolomei, Williams, and Sears did not come to them in a dream, nor was it the result of a coin flip. They settled on their strategy only after commissioning an exhaustive social history of Mitchell and his family, having Mitchell studied stem-to-stern by a'team of doctors in a variety of specialties at the University of Arizona medical school, conducting personal interviews with potential witnesses, making numerous trips to the Navajo reservation, and spending countless hours with Mitchell himself. Counsel, who had years of experience defending violent crimes committed on Indian reservations, also contacted other lawyers who specialized in death penalty defense and sought their advice. Counsel affirmatively considered the pros and cons of other approaches, and then reasonably chose the strategy that they thought had the best chance of success. Such a decision does not support a claim of ineffective assistance of counsel. Elmore v. Sinclair, 781 F.3d 1160, 1170-72 (9th Cir.2015).
Apparently recognizing that- trial counsel’s strategic and tactical decisions are entitled to great deference, Mitchell argues that his lawyers’ investigation was deficient, thereby tainting their strategy and tactics. For example, Mitchell contends that when Mitchell’s lawyers learned that Dr. Morenz had diagnosed Mitchell with antisocial personality disorder (just as psychologist Dr. Parrish had) counsel should have had Mitchell examined again by yet another doctor in search of a less damning diagnosis. We agree with the district court that defense counsel did not act below professional standards in relying on the thorough and authoritative report of the highly qualified experts they hired, particularly when Drs. Parrish and Mor-enz independently agreed on the same primary diagnosis after extensive testing. Crittenden v. Ayers, 624 F.3d 943, 965-66 (9th Cir.2010).
Although Mitchell claims that the investigation was inadequate, he has come -forward with almost no new evidence not known to defense counsel and fully considered as possible mitigation. Mitchell’s drug abuse and physical abuse were documented in detail in the Ockenfels and Dr. Morenz reports well before the guilt and penalty trials. Contrary to Mitchell’s claim, defense counsel knew in 2003 that Mitchell and his friends had been partying and doing drugs in the months before the crimes. In fact, Dr. Morenz diagnosed polysubstance abuse based on Mitchell’s extensive drug use history. The evidence of drug use and physical abuse was known to the defense team and considered by the team when it decided not to present intoxication or abuse mitigation evidence.
Mitchell points out that neither defense counsel’s investigation, nor that of their mitigation specialist, Vera Ockenfels, uncovered the fact that Mitchell’s grandfather (with whom Mitchell had lived for a time) had molested two girls in Kansas sometime in the 1950s or '60s, about 20 years before Mitchell was born. Mitchell himself was never molested by the grandfather and Mitchell never met the girls. This bit of ancient family history was never disclosed to defense counsel, their investigator Karl Brandenberger, or Ockenfels, despite their numerous interviews with family members. The grandfather’s behavior in the '50s or '60s toward people other than Mitchell, whom Mitchell does not even know, before he was even born, is of dubious relevance when it comes to mitigation. In any event, Mitchell was entitled to a reasonable investigation, not a perfect one. See Yarborough v. Gentry, *893 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003).
In 2009, habeas counsel managed to find a doctor, Pablo Stewart. M.D., who would give them a declaration stating that in 2001 Mitchell suffered from post traumatic stress disorder and substance-induced psychotic disorder. Dr. Stewart’s declaration says that he could testify that Mitchell’s intoxication and mental illness “synergized with each other resulting in the alteration of Mr. Mitchell’s cognitive and behavioral function, which severely impaired his ability to premeditate or intend to commit murder.” (Never mind that Mitchell stated that he and Orsinger killed and dismembered the grandmother and little girl to get rid of the witnesses to the theft of the vehicle they stole for use in the trading post robbery they planned to commit.) At most, Dr. Stewart’s new diagnosis of Mitchell’s mental state, eight years after-the-fact, is a “difference in medical opinion, not a failure to investigate.” Crittenden, 624 F.3d at 965.
Finally, Mitchell faults defense counsel for not calling his mother, Sherry, to testify. But, Bartolomei testified that Sherry refused to cooperate and only wanted to talk about how Mitchell’s crimes impacted her. She walked out on her interview with Williams, and had told the FBI that Mitchell belonged in prison. Counsel reasonably concluded that Sherry was a “loose cannon” who was better kept away from the witness stand.
We agree with the district court that Mitchell’s lawyers made an adequate investigation and then, with full knowledge of all of the relevant facts, made reasonable strategic decisions to present what they did and to stay away from things that they thought would do more harm than good. Elmore, 781 F.3d at 1170-72. The possibility that some of the evidence rejected by defense counsel “could have assisted [Mitchell’s] case,” is “little more than a challenge to his defense attorney’s trial strategy with the benefit of hindsight.” Id. at 1171. Like the defense team in Elmore, which reasonably chose a “remorse strategy” over a mental health strategy, Mitchell’s defense team made a reasonable strategic decision to pursue what it believed to be the stronger life-worth-saving defense, along with evidence of sentencing disparity and evidence that the Navajo Nation wanted Mitchell’s life spared. They reasonably chose not to present evidence that “would detract from, or destroy,” the chosen strategy. Id. Considering the unusual brutality of these crimes — committed not in passion but in furtherance of a planned armed robbery— and that Mitchell himself refused to attend the penalty phase of the trial, it is a remarkable tribute to Mitchell’s lawyers that they were able to get the jury to find several mitigating factors.[6] Even assuming for the sake of argument that some other lawyer might have preferred a different strategy, there is no showing that Mitchell’s lawyers’ strategy was unreasonable. Bell v. Cone, 535 U.S. 685, 701-02, *894 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Because Mitchell did not rebut the presumption that counsel rendered effective assistance, the district court correctly denied Mitchell’s § 2255” motion with respect to the penalty phase of the trial.[7]
IV. Conclusion
The judgment of the district court is AFFIRMED.

. 18 U.S.C. § 3005 requires the appointment of at least two defense counsel in capital cases, including one who is "learned' in the law applicable to capital cases.”

. Santa Clara Law's Death Penalty College trains defense attorneys, along with their mitigation specialists, to represent defendants in death penalty cases. See http://law.scu.edu/ dpc.

. Defense counsel tried, but failed, to get into evidence Mitchell’s statement to the FBI that he had been drinking the day of the murders. Counsel then requested an intoxication instruction to preserve the record, even though they knew the request would be denied for lack of evidence. There is no reason to fault counsel for this.

. Mitchell never knew his father, and his father died before the defense team was able to locate and interview him.

. In the record, the name is also spelled Aus-ka.

. At least one juror found every factor presented by the defense to be mitigating for both murders. Twelve jurors found that: (1) Mitchell did not have a significant prior criminal record; (2) another person who was equally culpable in the crime would not be punished with death; and (3) Mitchell would be sentenced to life in prison without the possibility of release if not sentenced to death. Two jurors found that Mitchell responded well to structure and would adapt to life in prison. One juror found that Mitchell’s capacity to appreciate the wrongfulness of his conduct was so impaired as to constitute a defense to the charge. .Six jurors found that Mitchell’s childhood, background record, character or other circumstances of the offense mitigated against the death sentence. Finally, seven jurors found that the letter from the Navajo Nation opposing the death penalty was mitigating.

. We decline to grant a certificate of appeala-bility for the uncertified issues raised in Mitchell’s brief.