**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STEVEN CATLIN,

*Petitioner-Appellant*,

v.

RONALD BROOMFIELD, Warden, San Quentin State Prison,

*Respondent-Appellee*.

No. 19-99011

D.C. No. 1:07-cv-01466-LJO-SAB

OPINION

Appeal from the United States District Court for the Eastern District of California Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted September 26, 2024 San Francisco, California

Filed December 24, 2024

Before: MILAN D. SMITH, JR., RYAN D. NELSON, and PATRICK J. BUMATAY, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of California state prisoner Steven Catlin's 28 U.S.C. § 2254 habeas corpus petition challenging his 1990 conviction for murdering his fourth wife and his adoptive mother, as well as his death sentence.

The panel concluded that the standard of review set forth in the Antiterrorism and Effective Death Penalty Act applies to Catlin's claims because they were adjudicated on the merits by the California Supreme Court (CSC). That is true even though the CSC rejected some claims in Catlin's state habeas petition as procedurally barred because they had already been resolved in Catlin's first state habeas petition.

The panel held: (1) the CSC acted reasonably in rejecting Catlin's claims of error arising from the state trial judge's *ex parte* discussion with a juror; (2) the CSC acted reasonably in concluding that there was no ineffective assistance of counsel at the guilt phase of Catlin's trial; and (3) the CSC acted reasonably in concluding that there was no ineffective assistance of counsel at the penalty phase of Catlin's trial.

The panel declined to issue a certificate of appealability as to Catlin's uncertified claim that the state violated his due process rights by withholding exculpatory evidence and presenting false evidence.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Saor E. Stetler (argued), Law Offices of Saor E. Stetler, Mill Valley, California; Richard G. Novak, Law Offices of Richard G. Novak, Berkeley, California; for Petitioner-Appellant.

Kenneth N. Sokoler (argued) and Tami K. Krenzin, Supervising Deputy Attorneys General; Sean M. McCoy and Ross K. Naughton, Deputy Attorneys General; James W. Bilderback II, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, Sacramento, California; for Respondent-Appellee.

**OPINION**

M. SMITH, Circuit Judge:

California state prisoner Steven Catlin appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. In two separate trials, Catlin was convicted of murdering three family members with paraquat, a poisonous agricultural herbicide. The § 2254 petition in this case challenges Catlin's 1990 conviction for murdering his fourth wife, Joyce Catlin, and his adoptive mother, Martha Catlin, as well as his death sentence.

We affirm the district court's dismissal of the petition. Like the district court, we conclude that (1) the California Supreme Court (CSC) acted reasonably in rejecting Catlin's claims of error arising from the state trial judge's *ex parte* discussion with a juror; (2) the CSC acted reasonably in

concluding that there was no ineffective assistance of counsel at the guilt phase of Catlin's trial; and (3) the CSC acted reasonably in concluding that there was no ineffective assistance of counsel at the penalty phase of Catlin's trial. We also decline to issue a certificate of appealability as to Catlin's uncertified claim that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), by withholding exculpatory evidence and presenting false evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Factual History of Catlin's Crimes[1]

Steven Catlin has been convicted of three murders: the 1976 murder of his fourth wife, Joyce Catlin; the 1984 murder of his adoptive mother, Martha Catlin; and the 1984 murder of his fifth wife, Glenna Kaye Catlin.  The habeas petition in this case relates to Catlin's convictions for the murders of Joyce and Martha,[2] and the death sentence handed down for the murder of Martha.  Catlin was separately tried, convicted, and sentenced to life imprisonment for the death of Glenna, and neither his conviction nor his sentence for that crime are at issue here. However, the facts underlying Catlin's murder of Glenna are

---

[1] The following factual history is drawn from the CSC's opinion in *People v. Catlin*, 26 Cal. 4th 81 (2001), as well as "the record before us," *Fauber v. Davis*, 43 F.4th 987, 992 (9th Cir. 2022).  We presume that the CSC's findings are correct unless those findings are rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017).

[2] Because Catlin's wives and his mother share the same surname as Catlin, we primarily refer to them by their first names in this opinion.

relevant because they were presented to the jury at the guilt phase of the trial at issue.[3]

## A.  The Murder of Joyce Catlin

In 1973, Catlin married Joyce, his fourth wife. Throughout their marriage, Catlin engaged in extramarital affairs, which led to arguments between Catlin and Joyce.

In April 1976, Joyce developed flu-like symptoms and was admitted to a hospital in Bakersfield, eventually being placed in the intensive care unit.  Joyce complained of back pain, vomiting, and a sore throat.  Doctors, including a lung specialist, determined that her lungs were affected, and they treated her for a possible viral or bacterial infection with no success.  Eventually, Joyce's lungs stopped providing sufficient oxygen for her body to function, and she required mechanical ventilation.  On May 6, 1976—nineteen days after her admission to the hospital—Joyce's lungs failed, and she died.

The pathologist who performed the autopsy observed that Joyce's lungs were extremely heavy and fibrotic, and he found no indication of viral or bacterial infection that could have caused her death.  Joyce's lung specialist believed that the cause of death was pulmonary fibrosis—where the lungs develop massive scarring and cannot function.  He could not identify any natural cause for this condition.

Although it was not listed on Joyce's death certificate, several physicians suspected that she had been fatally poisoned with paraquat, a highly toxic herbicide used for controlling weeds.  According to a clinical toxicologist who

---

[3] However, the jury was not informed that Catlin had been convicted for the murder of Glenna until the penalty phase.

testified at Catlin's trial, when paraquat is ingested, the victim usually experiences a burning sensation in the mouth, followed by nausea, vomiting, and diarrhea. About a week after ingestion, paraquat begins to attack the lungs and the lungs develop fibrotic scarring.

Multiple experts testified at trial that they believed Joyce's death was caused by paraquat poisoning. Joyce's lung specialist believed that Joyce was killed by paraquat poisoning, in part based on Joyce's course of symptoms, the post-mortem appearance of her lungs, and the lack of any natural agent that could have caused her death. A different expert in lung pathology concluded that fibrosis had almost destroyed Joyce's lung tissue, that the fibrosis had been caused by a chemical, and that the only chemical that could produce such fibrotic scarring was paraquat. The lung pathologist noted that a colleague opined that Joyce's lung tissue constituted a "perfect example of paraquat poisoning." The clinical toxicologist testified that Joyce's course of symptoms was consistent with paraquat poisoning. In addition, the Chief Medical Examiner of the City and County of San Francisco also testified that Joyce had died of paraquat poisoning.

At the time of Joyce's death, there were no toxicological tests that could identify the presence of paraquat after more than seventy-two hours had passed from administration. Moreover, the fact that Joyce's lung tissues were preserved in formalin made it impossible to conduct later testing.

Although access to paraquat was controlled under state law at the time of Joyce's death, Catlin had access to the poison in 1976 and 1977 when he worked as a mechanic for Superior Farming, an agricultural company. Multiple witnesses recalled Catlin's familiarity with paraquat and the

peril that it posed. The year before Joyce's death, Catlin had warned Joyce's son about the dangers of paraquat and warned him not to enter Catlin's garage because it contained dangerous agricultural poisons. Additionally, some years earlier, Catlin had shown his second wife's father a vial of poison that Catlin said would kill anything or anybody, one he thought would be an ideal tool for a "perfect murder" because it was undetectable and had no antidote.

At the time of her death, Joyce participated in the Credit Life Program at the Kern Federal Credit Union, and the proceeds of that program were used to pay off a debt on an automobile owned by the couple. Additionally, according to the CSC, Joyce had an insurance policy paying up to $2,000 and a $5,000 insurance policy, the benefits of which were paid to Catlin.

### B. The Murder of Martha Catlin

Martha was Catlin's adoptive mother, and Catlin regularly visited her. Catlin visited his mother on December 2, 1984. On December 6, Martha phoned a friend to request assistance because she was seriously ill. Her friend observed that Martha appeared very sick and had swollen purple lips as well as dark circles under her eyes. When Martha arrived at the doctor's office, her tongue and throat were reddish-purple, and she had a fever. She died fewer than two days later at the age of seventy-nine.

Toxicological testing revealed that Martha had ingested a significant amount of paraquat. Multiple experts testified that paraquat poisoning had killed Martha, even though she did not have the same severe fibrosis that Joyce exhibited. Some experts opined that this was because Martha had died early in the course of paraquat poisoning due to her frailty.

At Catlin's trial for the murders of Joyce and Martha, the State presented evidence that Catlin had grown tired of caring for Martha (as well as traveling from Fresno to Bakersfield to visit her), and that he had made statements indicating that he wished she would "hurry up and die." Catlin was also concerned that Martha was planning to alter her will to make the African Violet Society, rather than him, her primary beneficiary. At the time of Martha's death, Catlin was still the sole beneficiary of her will.

There were other possible sources of tension between Martha and Catlin, including Catlin's many marriages and (according to Catlin's third wife Edith Ballew) Martha's repeated threats to leave Catlin out of her will. Furthermore, Catlin had retained possession of money that he had withdrawn from his mother's account even though that money was intended to be used as a down payment on a new home for Martha. The parties presented evidence that, when Catlin was a child, Martha made him dress in girls' clothing and made him feel that Martha wished she had adopted a girl instead.

## C.  The Murder of Glenna Kaye Catlin

Catlin had already been tried, convicted, and sentenced to life imprisonment for the murder of his fifth wife, Glenna Kaye Catlin, by the time of trial in this case. But the facts underlying Glenna's death remain relevant because they were reported to the jury at the guilt phase and the jury learned of his conviction at the penalty phase.

The marriage between Catlin and Glenna was rocky: Catlin viewed it as a marriage of convenience and had been unfaithful, which made Glenna jealous. On February 16, 1984, Catlin and Glenna had a public argument, and Catlin was described as "smirk[ing]" at Glenna.

A few days after the argument, Glenna became ill. After an illness spanning several weeks, Glenna died on March 14. Subsequent toxicological testing showed that Glenna had died of paraquat poisoning. Some years before Glenna's death, Catlin had warned Glenna's half-brother about the dangers of paraquat, including that it could damage the lungs.

After Glenna's death, Catlin received a substantial life insurance payout of over $55,000. He also exhibited high spirits after Glenna's death even though he had displayed grief at her funeral.

### D. Discovery of the Paraquat Bottle

After Catlin was arrested, his former father-in-law, Glenn Emery (Glenna's stepfather), searched his automotive business at the urging of law enforcement. Catlin had access to the business because it was located on property where he had lived and worked. Law enforcement had not previously searched that area based on Emery's representation that he was familiar with the premises and would have found paraquat (or any other evidence) if there had been anything to find. But in a later conversation, law enforcement officials urged Emery to search the shared premises.

In the subsequent search, Emery found a bottle of paraquat in a cabinet. The bottle had been filled or manufactured in April 1977 (after the death of Joyce but before the deaths of Martha and Glenna). Catlin's fingerprint was on the cap of the paraquat bottle.

Alfred Bettencourt, Catlin's auto shop partner, testified that he had seen that bottle in a box when he and Catlin were moving Catlin's auto shop from the premises shared with Emery to a different location, about a month before Glenna's

death.  Bettencourt asked Catlin what to do with the box containing the bottle, and Catlin told him to put it back where he found it.

### E.  The Jailhouse Informant

While Catlin was being held in the Kern County Jail after being arrested (likely for the murder of Joyce), he met an inmate named Conward Hardin.  Hardin, a jailhouse informant, later related to law enforcement that Catlin solicited his assistance in intimidating Edith Ballew, Catlin's third wife, who had been a driving force in the investigation and prosecution of Catlin.  The goal was to persuade Edith not to testify, and Catlin suggested that Hardin could wear a mask and use a weapon to "persuade" Edith.  Hardin also reported that, during a conversation with Hardin about their difficulties with women, Catlin had stated, "I killed the bitches."  But Hardin did not recall much of that conversation.

## II.  Procedural History

### A.  Catlin's 1990 Kern Trial

There was suspicion of foul play following Joyce's death in 1976, but her murder was not prosecuted until some years later—following the 1984 deaths of Glenna and Martha. This delay was due to several factors: the limits of laboratory testing, the fact that her tissues were preserved in a manner that precluded paraquat testing, and the early caution of medical and pathological experts concerning whether they could confidently offer an opinion on the cause of Joyce's death.  Ultimately, Catlin was charged with the deaths of Joyce and Martha in an information filed in Kern County on December 23, 1985.  The information charged several special circumstances for the death of Martha, including that

Martha had been murdered for financial gain, the murder was committed with poison, and the defendant had committed more than one murder.

Catlin's trial for the deaths of Joyce and Martha (the Kern Trial) began on April 23, 1990. Catlin was represented in the Kern Trial by attorneys Dominic Eyherabide and Michael Dellostritto.[4] During the guilt phase of the trial, the jury heard testimony from a variety of witnesses, including members of law enforcement, doctors and other medical personnel, members of Glenna's family, acquaintances of Catlin, Catlin himself, and—particularly important to Catlin's habeas petition—Hardin, the jailhouse informant.

Catlin's defense was that he did not poison anyone and never knowingly possessed paraquat. He also contended that, based on his experts' testimony regarding the timeline of paraquat poisoning, it was impossible for him to have poisoned Martha or Glenna. Catlin, who testified in his own defense, also tried to paint his relationship with his adoptive mother in a positive light, contending that Martha never threatened to cut him out of her will. In the same vein, he denied that he ever told an acquaintance that his mother wished she had adopted a girl or that his mother had dressed him in girl's clothing during his childhood. Catlin also presented evidence that his business ventures were succeeding, so he lacked a financial motive for the crimes.

On June 1, 1990, the jury found Catlin guilty of two counts of first-degree murder. As to Count 2 (which related to the murder of Martha), the jury found true the special circumstances that Catlin murdered Martha for financial

---

[4] Eyherabide's surname is spelled differently at several points in the record. We use the spelling that appears most frequently.

gain, that he did so by the administration of poison, and that Catlin had committed multiple murders. *See* Cal. Penal Code § 190.2(a)(1), (3), (19) (West 1989).

The penalty phase took place a few days later. As part of the aggravation evidence introduced, Catlin stipulated that he had previously been convicted of the first-degree murder of Glenna. *See* Cal. Penal Code § 190.2(a)(2) (West 1989). The State also presented evidence from Catlin's first wife, who testified that Catlin had physically assaulted and choked her.

Catlin's defense counsel presented mitigation evidence. Specifically, defense counsel presented the testimony of several witnesses: members of a family that Catlin had guided and mentored; testimony from a woman whose child was saved by Catlin; a psychologist's opinion about Catlin's good behavior while incarcerated; and prison officials who testified as to Catlin's good behavior and valuable contributions to the prison workforce.

The jury deliberated for less than two-and-a-half hours before returning a sentence of death for Martha's murder. The state trial court determined that the weight of the evidence supported the jury's findings and verdicts and observed that the aggravating circumstances far outweighed the mitigating circumstances. It accordingly ordered that "the penalty of death is to be inflicted upon the defendant."

On automatic appeal, the CSC affirmed Catlin's conviction and sentence. *People v. Catlin*, 26 Cal. 4th 81 (2001). The CSC later denied Catlin's petition for rehearing. The United States Supreme Court denied Catlin's petition for a writ of certiorari.

## B.  Catlin's Collateral Challenges

Catlin filed his first state habeas petition in 2000.  This petition included most of the claims that are now at issue in this appeal.  The CSC summarily denied the petition in 2007. It denied most of Catlin's claims on the merits, but also rejected some of the claims on procedural grounds.

In 2008, Catlin filed the operative federal habeas petition pursuant to 28 U.S.C. § 2254.  The petition raised over sixty different claims, challenging various aspects of the guilt and penalty phases, as well as other aspects of the proceedings against Catlin.  As relevant here, Claims 10 and 11 in the petition alleged constitutional error arising from an *ex parte* conversation between the trial judge and a juror.  Claim 23 alleged that the State had violated its constitutional obligations pursuant to *Brady* and *Napue* by failing to disclose impeachment information relating to Hardin.  Claim 23 further alleged that the State had presented false testimony regarding the benefits received by Hardin in exchange for his testimony.  Claim 26(A) alleged ineffective assistance of counsel at the guilt phase due to defense counsel's failure to properly impeach Hardin.  Claim 35, including all subclaims, alleged ineffective assistance of counsel at the penalty phase.  Subclaim 35(F) was a claim of cumulative error from the purported ineffective assistance at the penalty phase.

After Catlin filed his § 2254 petition, the district court ordered the federal action held in abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), while Catlin exhausted some of his claims in state court.  Catlin then filed his second state habeas petition, which raised many of the same claims as his first state habeas petition, as well as some new ones.  In 2013, the CSC summarily denied the petition.

It rejected some of Catlin's challenges on the merits, including subclaim 35(F). It rejected other claims—including Claims 10, 11, 23, 26, and 35(A)–(C)—as procedurally barred for a variety of reasons, including that they were untimely or had been raised in Catlin's first state habeas petition.[5]

Catlin returned to federal court, where he filed a motion for discovery and evidentiary development. The State filed its answer to Catlin's § 2254 petition, and the motion and petition were fully briefed.

On December 17, 2019, the district court denied Catlin's petition and his motion for discovery and evidentiary development. The district court granted a certificate of appealability (COA) on Claims 10, 11, 26(A), 35(A), 35(B), 35(C), and 35(F). Catlin timely filed a notice of appeal.

---

[5] Before the district court, the State asserted that the CSC's conclusion that many of Catlin's claims were procedurally barred for various reasons, including untimeliness, foreclosed federal habeas relief because those procedural bars constituted "adequate and independent grounds" to bar review. The State is correct that, as a general matter, federal review of procedurally defaulted claims is barred unless the habeas petitioner can show cause for the default and actual prejudice (or that a failure to consider the claims would result in a fundamental miscarriage of justice). *See Rodney v. Filson*, 916 F.3d 1254, 1259 (9th Cir. 2019). But the State has not invoked any procedural bars on appeal, so it has forfeited any reliance on them. *See McDermott v. Johnson*, 85 F.4th 898, 907 (9th Cir. 2023), *cert. denied sub nom. McDermott v. Cruz*, --- S. Ct. ----, 2024 WL 4655012 (Nov. 4, 2024) (mem.); *see also Clark v. Chappell*, 936 F.3d 944, 982 (9th Cir. 2019). We accordingly decline to reach the question of whether the procedural bars applied by the CSC foreclose any of the habeas relief sought by Catlin.

## JURISDICTION AND STANDARD OF REVIEW

### I.  Jurisdiction

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which indisputably applies to Catlin's habeas petition,[6] circumscribes our ability to hear appeals in habeas corpus proceedings.  *See Gonzalez v. Thaler*, 565 U.S. 134, 140 (2012); *Smith v. Mahoney*, 611 F.3d 978, 993 (9th Cir. 2010).  Specifically, "before a federal court may entertain an appeal from a 'final order in a habeas corpus proceeding,' a petitioner 'must first seek and obtain'" a COA.  *Rose v. Guyer*, 961 F.3d 1238, 1243 (9th Cir. 2020) (citations omitted) (first quoting 28 U.S.C. § 2253(c)(1)(A); then quoting *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003)).  "A COA is a 'jurisdictional prerequisite,' which serves a 'gatekeeping function' by 'screen[ing] out issues unworthy of judicial time and attention and ensur[ing] that frivolous claims are not assigned to merits panels.'"  *Id.* (alterations in original) (citations omitted) (first quoting *Miller-El*, 537 U.S. at 336; then quoting *Thaler*, 565 U.S. at 145).

Here, the district court granted a COA on Claims 10, 11, 26(A), and subclaims A, B, C, and F of Claim 35.  We accordingly have jurisdiction over these claims pursuant to 28 U.S.C. § 1291 and 2253.  *See, e.g.*, *Hart v. Broomfield*, 97 F.4th 644, 648 (9th Cir. 2024).

However, Catlin's appellate briefing also includes arguments related to Claim 23—a claim on which the district court did *not* issue a COA.  We accordingly lack jurisdiction

---

[6] Catlin's federal habeas petition was filed in 2008, well after AEDPA's April 24, 1996, effective date.  Thus, AEDPA applies to his petition.  *See Clark v. Broomfield*, 83 F.4th 1141, 1147 (9th Cir. 2023).

to rule in the first instance on Catlin's arguments related to Claim 23.  *See Payton v. Davis*, 906 F.3d 812, 818 (9th Cir. 2018).  But "[w]hen a brief includes uncertified issues, we may treat it as a request to expand the scope of the certificate of appealability."  *Robertson v. Pichon*, 849 F.3d 1173, 1187 (9th Cir. 2017) (quoting *Delgadillo v. Woodford*, 527 F.3d 919, 930 (9th Cir. 2008)); *see also* Ninth Circuit Rule 22-1(e).

"Under AEDPA, a certificate of appealability . . . cannot be issued or expanded unless 'the applicant has made a substantial showing of the denial of a constitutional right.'" *Robertson*, 849 F.3d at 1187 (quoting 28 U.S.C. § 2253(c)(2)).  "'We look to the District Court's application of AEDPA to [the petitioner's] constitutional claims,' and [the petitioner] 'must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong' in light of AEDPA."  *Id.* (citations omitted) (quoting *Miller-El*, 537 U.S. at 336, 338).

## II.  Standard of Review

"We review a district court's denial of a 28 U.S.C. § 2254 petition de novo."  *Fauber v. Davis*, 43 F.4th 987, 996 (9th Cir. 2022) (quoting *Bolin v. Davis*, 13 F.4th 797, 804 (9th Cir. 2021)), *cert. denied*, 143 S. Ct. 2585 (2023) (mem.).  But because Catlin's petition is subject to AEDPA, we must review Catlin's claims under the deferential standard set out by that statute.  *See id.*

"Under AEDPA, we must defer to the state court's decision on any claim adjudicated on the merits unless the decision was 'contrary to, or involved an unreasonable application' of 'clearly established Federal law' or was 'based on an unreasonable determination of the facts in light

of the evidence presented.'" *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019) (quoting 28 U.S.C. § 2254(d)). This deferential standard "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)).

Section 2254(d)(1) permits habeas relief when the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1); *see also Fauber*, 43 F.4th at 996. "Under § 2254(d)(1), 'clearly established' 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Marks v. Davis*, 106 F.4th 941, 949 (9th Cir. 2024) (alteration in original) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)). "A state court's decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Id.* (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). "A state court's decision involves 'an unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (alteration in original) (quoting *Williams*, 529 U.S. at 413).

Under the unreasonable-application prong, "[t]he state court's application of federal law must stand unless it was

'objectively unreasonable.'" *Fauber*, 43 F.4th at 996–97 (quoting *Bell v. Cone*, 535 U.S. 685, 698–99 (2002)). This standard is intentionally "challenging . . . to meet." *Bolin*, 13 F.4th at 805. To satisfy this standard, a petitioner "must show far more than that the state court's decision was merely wrong or even clear error." *Fauber*, 43 F.4th at 996 (quoting *Bolin*, 13 F.4th at 804). "Instead, '[t]he prisoner must show that the state court's decision is so obviously wrong that its error lies "beyond any possibility for fairminded disagreement."'" *Bolin*, 13 F.4th at 805 (alteration in original) (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam)).

Notably, this standard applies even where the state's highest court summarily denies the petitioner's state habeas claims on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 187 (2011); *Fauber*, 43 F.4th at 999. Thus, even when the "state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Fauber*, 43 F.4th at 999 (quoting *Richter*, 562 U.S. at 98). In these situations, our inquiry is two-fold: "what arguments or theories . . . could have supported the state court's decision," and then "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* (omission and alteration in original) (quoting *Richter*, 562 U.S. at 102).

We conclude that the AEDPA standard of review applies to Catlin's claims because they were adjudicated on the merits by the CSC.**[7]**  That is true even though the CSC

---

[7] There is some complexity associated with whether subclaim 35(F), which asserts a claim of cumulative error related to ineffective assistance

rejected some claims—including Claims 10, 11, 23, 26(A), and 35(A) through (C)—in Catlin's second state habeas petition as procedurally barred because they had already been resolved in Catlin's first state habeas petition. *See Cone v. Bell*, 556 U.S. 449, 466 (2009) ("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review."); *see also Guillory v. Allen*, 38 F.4th 849, 856 (9th Cir. 2022).

We reject Catlin's argument that AEDPA is inapplicable because the summary denial of his claims without the opportunity for evidentiary development indicates that there was no adjudication on the merits. As a starting point, this argument was not raised with any clarity until Catlin's reply brief, which is reason enough for us to decline to consider it. *See Iraheta-Martinez v. Garland*, 12 F.4th 942, 959 (9th Cir. 2021) ("[B]y failing to develop the argument in his opening brief, Iraheta forfeited it."); *Rowland v. Chappell*, 876 F.3d

---

of counsel at the penalty phase, was adjudicated on the merits in response to Catlin's first state habeas petition or his second. The CSC's 2013 summary denial of Catlin's second state habeas petition indicated that it was denying subclaim 35(F) on the merits. But claims that were substantively the same as subclaims 35(A), 35(B), and 35(C) were denied on the merits in the first habeas petition. If subclaim 35(F) was "sufficiently related" to or "intertwined" with these claims, it would have been considered raised in the first habeas petition. *See Wooten v. Kirkland*, 540 F.3d 1019, 1025 (9th Cir. 2008). This appears to be the position that Catlin takes on appeal. But we need not decide which of the two CSC denials—the 2007 opinion rejecting the first state habeas petition or the 2013 opinion rejecting the second state habeas petition— is the operative one with respect to subclaim 35(F) because the AEDPA standard of review would apply in either circumstance. *See Avena*, 932 F.3d at 1247.

1174, 1193 n.6 (9th Cir. 2017) ("Rowland has waived this argument by not raising it in his opening brief.").

But even overlooking Catlin's waiver, this argument fails. As explained above, the AEDPA standard of review applies to summary merits denials of a petitioner's claims. *See Pinholster*, 563 U.S. at 187; *Fauber*, 43 F.4th at 999. Contrary to Catlin's contentions, this rule applies even where a state's highest court—including the CSC—has summarily determined, without holding an evidentiary hearing, that a party has failed to state a prima facie case. *See Ochoa v. Davis* (*Ochoa II*), 50 F.4th 865, 888 (9th Cir. 2022), *cert. denied sub nom. Ochoa v. Smith*, 144 S. Ct. 381 (2023) (mem.); *see also Pinholster*, 563 U.S. at 187; *Bolin*, 13 F.4th at 805. Indeed, we recently addressed this specific question and concluded that "the California Supreme Court's summary denial . . . is a decision on the merits and thus entitled to AEDPA deference." *Ochoa II*, 50 F.4th at 888.

Thus, we must view all of Catlin's claims through the deferential prism of AEDPA review.

## ANALYSIS

On appeal, Catlin raises arguments on all claims covered by the district court's certificate of appealability—Claims 10, 11, 26(A), and subclaims (A), (B), (C), and (F) of Claim 35. He also seeks to expand his COA to encompass Claim 23.

All of Catlin's claims are meritless. As to the certified claims, Catlin has not shown that the CSC acted contrary to or unreasonably applied clearly established federal law. As to Catlin's request to expand his certificate of appealability, we conclude that no reasonable jurist could debate the

district court's resolution of Claim 23.  We thus affirm the district court's denial of Catlin's § 2254 habeas petition.

## I.  Certified Claims

### A.  Claims 10 and 11

#### 1.  Overview

Claims 10 and 11 arise from an incident that occurred during the guilt phase of Catlin's Kern Trial.  Specifically, Catlin contends that during the Kern Trial, one juror became concerned after Hardin, the jailhouse informant, apparently followed her for several blocks after the trial adjourned for the day.  The juror was frightened and intimidated, and she brought the incident to the attention of the state trial judge and bailiff.  The trial judge questioned her about the incident in the presence of other jurors—but apparently not in the presence of defense counsel.  The trial judge stated that "[t]his won't be tolerated."  The trial judge later informed the juror that Hardin "was supposed to be taking the bus to Fresno" and that "nothing would happen to [her]."  This interaction was not captured in the trial transcript; instead, Catlin relies on juror declarations, including a declaration from the juror who was concerned that Hardin was following her.

Claim 10 alleges that the *ex parte* communication between the trial judge and the juror, outside of the presence of defense counsel, violated Catlin's due process rights, as well as a variety of other rights under the Fifth, Sixth, and Eighth Amendments.  The focus of Claim 10 is that this event resulted in the denial of Catlin's right to an impartial jury.  According to Catlin, the exclusion of him and his defense counsel from the communication with the juror constituted structural error.  Claim 11 alleges that the *ex*

*parte* communication resulted in the denial of Catlin's right to counsel during a critical stage of the proceeding.

Catlin originally raised these claims in his first state habeas petition, and the CSC summarily denied them on the merits. In his second habeas petition, Catlin raised these claims again, and the CSC dismissed them as untimely, successive, and repetitive. As such, the AEDPA standard of review applies. *See Cone*, 556 U.S. at 466.

The district court rejected Claims 10 and 11 (along with several related claims that Catlin does not press on appeal). Regarding Claim 10, the district court concluded that the CSC could have reasonably rejected Catlin's due-process claims and observed that the claims would fail even under a de novo standard. The district court reasoned that the *ex parte* communication, which was short, was harmless beyond a reasonable doubt and did not rise to the level of structural error. The district court also reasoned that the alleged incident would be more likely to prejudice the State, which had called Hardin as a witness, than Catlin.

Regarding Claim 11, the district court determined that the CSC reasonably could have concluded that there was no denial of Catlin's right to counsel. It reasoned that, in light of the minor nature of the *ex parte* communication, the CSC could conclude that the communication "did not deny [Catlin] a fair trial or constitute a critical stage of the trial." And even if there was error, the CSC could reasonably find it harmless.

### 2. Analysis

Under AEDPA, Catlin must show that the CSC acted contrary to or unreasonably applied clearly established federal law in rejecting Claims 10 and 11. Catlin cannot

make this showing: to the contrary, the CSC's denial of these claims fully accords with applicable Supreme Court precedent.

In *Rushen v. Spain*, 464 U.S. 114, 119 (1983) (per curiam), the Supreme Court made clear that "[w]hen an *ex parte* communication," including a judge's discussion with a juror, "relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." But it also made clear that *ex parte* communications do not necessarily entitle a criminal defendant to relief; instead, like most trial errors, improper *ex parte* communications are subject to harmless-error review. *See id.* at 118–19; *see also Medina v. Hornung*, 386 F.3d 872, 878 (9th Cir. 2004) ("Improper *ex parte* remarks made by the judge to the jury are subject to harmless error analysis.").

In this case, we need not decide whether the state trial judge's *ex parte* communication with the juror was improper. Even assuming that the communication constituted error, the CSC reasonably could have concluded that the error was harmless.

Indeed, it is hard to see how there *could* be prejudice to Catlin's case under the circumstances of the *ex parte* communication here. As the district court observed, the brief *ex parte* communication revealed information that was likely to accrue in Catlin's favor—namely, that a prosecution witness (Hardin) had possibly followed a juror. This evidence would be more likely to cause the jury to look with disfavor on Hardin, a prosecution witness, than it would be to have any negative effect on Catlin's defense.

Notably, Catlin does not develop any argument that there was actual prejudice to him stemming from the *ex parte*

communication.  He has thus waived any argument that there was actual prejudice.  *See Iraheta-Martinez*, 12 F.4th at 959; *Rowland*, 876 F.3d at 1193 n.6.  Instead, he contends that a showing of prejudice was unnecessary for two reasons.  Both are unavailing.

Catlin first insists that, due to the lack of a record about what was actually said between the trial judge and the juror, the *ex parte* communication constituted structural error requiring reversal regardless of prejudice.  Put differently, Catlin contends that the *ex parte* communication was a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards."  *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).

Catlin's argument, which relies heavily on outdated case law, is squarely foreclosed by *Rushen*.  There, the Supreme Court rejected the position that "an unrecorded *ex parte* communication between trial judge and juror can never be harmless error," observing that such a rule would "ignore[] . . . day-to-day realities of courtroom life" and "undermine[] society's interest in the administration of criminal justice."  *Rushen*, 464 U.S. at 119.  It concluded that, consequently, *ex parte* communications could be harmless errors, depending on the circumstances of the case.  *See id.* at 119–20.  Thus, Catlin's appeal to the structural-error doctrine fails.  This is not one of the exceedingly narrow circumstances in which a structural error can be found.  *See Medina*, 386 F.3d at 877.  Moreover, Catlin has not even attempted to show that the error actually prejudiced him.

Catlin next contends that the *ex parte* communication was presumptively prejudicial under the doctrine of *Remmer*

*v. United States*, 347 U.S. 227, 229 (1954). But the presumption of prejudice referred to in *Remmer* applies in cases of jury tampering—not in cases involving run-of-the-mill *ex parte* communications between a trial judge and juror. *See United States v. Dutkel*, 192 F.3d 893, 895 (9th Cir. 1999); *see also Godoy v. Spearman*, 861 F.3d 956, 968 n.6 (9th Cir. 2017) (en banc) (observing that the *Remmer* presumption of prejudice applies when there is "*outside* contact raising a credible risk of influencing the verdict" (emphasis added)).

For those reasons, the CSC reasonably could have concluded that even if the state trial court erred in having an *ex parte* communication with a juror, such an error would be harmless. The district court properly denied Claims 10 and 11.

## B. Claim 26(A)

### 1. Claim Overview

Claim 26(A) alleges ineffective assistance of counsel at the guilt phase of Catlin's Kern Trial due to defense counsel's failure to investigate and effectively impeach Hardin, the jailhouse informant witness.

In Claim 26(A), Catlin contends that his defense counsel (1) failed to properly investigate all benefits that the State provided Hardin in exchange for his testimony against Catlin and (2) failed to adequately use the impeachment material within his possession. This claim was initially presented to the CSC in Catlin's first state habeas petition and rejected on the merits, so the AEDPA standard of review applies. *See Cone*, 556 U.S. at 466.

Applying this standard, the district court rejected Claim 26(A). The district court determined that the CSC

reasonably could have concluded that Catlin had not shown deficient performance or prejudice, both of which are required for a claim based on ineffective assistance of counsel.

Regarding deficient performance, the district court observed that defense counsel investigated Hardin's deals with law enforcement and repeatedly brought up the benefits received by Hardin on cross-examination, so the CSC reasonably could have concluded that defense counsel did not perform deficiently. Regarding prejudice, the district court observed that defense counsel did impeach Hardin about his informant status, the circumstances of the alleged confession, and the benefits he received. It also observed that prejudice was unlikely given that there was a substantial amount of other evidence against Catlin. Considering these realities, the district court determined that the CSC reasonably could have concluded that there was no likelihood of prejudice.

### 2.  Standard for Ineffective Assistance of Counsel on Habeas Review

"*Strickland v. Washington* and its progeny constitute the clearly established federal law governing claims of ineffective assistance of counsel." *Andrews v. Davis*, 944 F.3d 1092, 1107 (9th Cir. 2019) (en banc) (citing *Pinholster*, 563 U.S. at 189). Under the *Strickland* standard, a petitioner must show that "(1) his trial counsel's performance 'fell below an objective standard of reasonableness' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bible v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). "A '[f]ailure to make the required

showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.'" *Id.* (alteration in original) (quoting *Strickland*, 466 U.S. at 700). "The 'ultimate focus' of the *Strickland* standard is 'the fundamental fairness of the proceeding whose result is being challenged.'" *Andrews*, 944 F.3d at 1108 (quoting *Strickland*, 466 U.S. at 696).

Under the deficient-performance prong of *Strickland*, "[o]ur review 'of counsel's performance must be highly deferential.'" *Livaditis v. Davis*, 933 F.3d 1036, 1045 (9th Cir. 2019) (quoting *Strickland*, 466 U.S. at 689). "'[P]revailing professional norms' at the time of the representation serve as the objective standard of reasonableness under which counsel's performance is measured." *Avena*, 932 F.3d at 1248 (alteration in original) (quoting *Strickland*, 466 U.S. at 688). "We must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Livaditis*, 933 F.3d at 1045 (quoting *Strickland*, 466 U.S. at 689). Counsel's "strategic choices made after thorough investigation of law and facts" are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Under the prejudice prong, the inquiry is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ayala v. Chappell*, 829 F.3d 1081, 1096 (9th Cir. 2016) (quoting *Strickland*, 466 U.S. at 694).

The deferential *Strickland* standard is modified by AEDPA, which makes it even more difficult for petitioners to succeed. "When reviewing a state court's decision on a

*Strickland* claim under AEDPA, the federal court's review must be 'doubly' deferential." *Livaditis*, 933 F.3d at 1045 (quoting *Richter*, 562 U.S. at 105); *see also Ross v. Davis*, 29 F.4th 1028, 1042 (9th Cir. 2022) ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (quoting *Richter*, 562 U.S. at 105)). This is because of the generality of the *Strickland* standard, which gives state courts "greater leeway" in exercising their judgment. *Livaditis*, 933 F.3d at 1045 (quoting *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010)).

Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Ochoa II*, 50 F.4th at 889 (quoting *Richter*, 562 U.S. at 105); *see also Livaditis*, 933 F.3d at 1045–46 (framing the inquiry when an ineffective-assistance claim is summarily denied as "'whether there is any reasonable argument' that could have supported that decision under the deferential standard that applies in this context" (quoting *Richter*, 562 U.S. at 105)).

The evidence that we may look to in reviewing an ineffective-assistance claim is also circumscribed by AEDPA. "Under § 2254(d)(1), our review is 'limited to the record that was before the state court that adjudicated the claim on the merits.'" *Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) (quoting *Pinholster*, 563 U.S. at 181). This is because "AEDPA's 'backward-looking language requires an examination of the state-court decision at the time it was made.'" *Id.* (quoting *Pinholster*, 563 U.S. at 182).

### 3.  Analysis

The district court's denial of Claim 26(A) was appropriate.  The CSC reasonably could have concluded that Catlin had satisfied neither the ineffective-assistance prong nor the prejudice prong of *Strickland*.

### a.  Ineffective Assistance

As noted, Catlin contends that his trial counsel was ineffective because (1) he failed to investigate or impeach Hardin regarding the benefits that Hardin received in exchange for his testimony; and (2) he failed to present evidence that Hardin had a reputation for dishonesty, as well as substance abuse issues and a history of criminal behavior. Under the "doubly deferential" standard of review applicable here, we have no trouble rejecting these arguments.  The CSC reasonably could have concluded that defense counsel's performance fell within the wide latitude of reasonable representation.

We reject Catlin's argument that defense counsel acted ineffectively in failing to adequately impeach Hardin with evidence of *all* the benefits he received in exchange for his testimony.   Importantly, defense counsel *did* impeach Hardin based on a number of benefits—including having charges dismissed or otherwise reduced—that he received in exchange for his testimony.  On cross-examination, defense counsel brought out the fact that Hardin had previously served as a police informant in exchange for having charges against him dropped.  Defense counsel had an opportunity to examine Hardin's criminal record, and he cross-examined Hardin on multiple charges that were dropped or may have been dropped in exchange for Hardin providing testimony against Catlin.  Defense counsel questioned Hardin about the myriad charges that he faced—and which of them were

dropped—including assault with a deadly weapon and multiple failures to appear.

Hardin was evasive and claimed he did not recall some of the charges that defense counsel suggested had been dropped. He also suggested, at times, that some of the charges had been dropped for reasons other than his deal with the prosecution. But, under defense counsel's cross-examination, Hardin contradicted himself about whether certain charges had been dismissed and gave implausible testimony.

Defense counsel asked Hardin whether it was "true that since 1985, [he had] got virtually every charge[] made against [him] dismissed." When Hardin denied that claim, defense counsel pressed him on specifics and brought out inconsistencies in his testimony. Hardin eventually admitted that he "basically got out of jail" as part of the deal he made with the State and did not have to serve any more jail time on any of the charges pending against him in 1985.

Catlin contends that defense counsel failed to establish that specific charges, such as a charge for petty theft, were dismissed in exchange for Hardin's testimony. He further argues that counsel should have dug deeper and obtained records about some of Hardin's convictions.

We owe a great deal of deference to the informed strategies of counsel, including on the scope of cross-examination. *See Strickland*, 466 U.S. at 690; *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). Here, in a cross-examination that spanned almost thirty pages of trial transcript, defense counsel repeatedly questioned Hardin about the benefits he received and his criminal history. Faced with Hardin's evasive answers, defense counsel cast Hardin as an incredible and biased witness. Defense counsel

reasonably could have concluded that further cross-examination on the benefits received by Hardin would be redundant or even—given the confusing nature of Hardin's voluminous criminal history and list of pending charges—confusing to the jury. "[A]n attorney is not required to offer evidence that is unnecessary or redundant," *Lopez v. Allen*, 47 F.4th 1040, 1050 (9th Cir. 2022), and it was reasonable for defense counsel to decline to conduct further investigation or continue cross-examining Hardin on a topic that had already been aired before the jury. *See Strickland*, 466 U.S. at 690–91; *Lopez*, 47 F.4th at 1050; *Turner v. Calderon*, 281 F.3d 851, 875 (9th Cir. 2002); *cf. Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) ("We agree with the district court that while [the attorney] could have done a much better job of impeaching [the witness], his efforts in this respect were not constitutionally inadequate. The additional impeachment evidence would have been largely cumulative, albeit stronger, but the failures regarding impeachment . . . are of comparatively little consequence[] . . . ."); *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) (en banc) (concluding that it was not ineffective assistance for an attorney to decline to present redundant impeachment evidence that a witness had felony convictions).

We are also unpersuaded by Catlin's arguments that defense counsel acted deficiently in failing to investigate or present evidence regarding Hardin's reputation for lying, substance abuse issues, and criminal past. We agree with the district court that defense counsel reasonably could have concluded that issues of Hardin's credibility—and pattern of criminality, as well as his history of violence against women—were already before the jury and further discussion would be unnecessary or counterproductive. Hardin himself

admitted that he had lied to Catlin, and he responded evasively to defense counsel's questions. Moreover, he was cross-examined about his charges for abuse and battery, clearly implicating his violence and pattern of criminality. Considering that, defense counsel reasonably could have concluded that further impeachment evidence on Hardin's character for dishonesty and his other negative characteristics was unnecessary.

In sum, applying the deferential AEDPA standard of review, the CSC reasonably could have concluded that defense counsel's performance was not constitutionally deficient under *Strickland*.

### b. Prejudice

Even if we were to agree with Catlin that defense counsel acted deficiently—which we do not—there is an independent reason to affirm the district court's denial of Claim 26(A): the CSC reasonably could have concluded that Catlin failed to show prejudice. That is so for several reasons.

*First*, the testimony that Hardin gave about Catlin's jailhouse confession was only a small piece of the evidence against Catlin. In addition to Hardin's testimony, the State presented evidence that (1) Martha, Joyce, and Glenna were close relatives of Catlin; (2) all three victims died of paraquat poisoning; (3) a bottle of paraquat with Catlin's fingerprint was found in an area that Catlin had access to; (4) Catlin was familiar with, and had access to, paraquat; (5) Catlin had previously mentioned the possibility of using poison as a murder weapon; (6) Catlin benefitted financially and in other ways from the deaths of Martha, Joyce, and Glenna; and (7) Catlin had quarreled with or expressed discontent about the victims before their deaths. The fact

that Hardin's testimony was only one facet of the considerable evidence against Catlin means that any failure to impeach Hardin would almost certainly not be prejudicial. *See Dickey v. Davis*, 69 F.4th 624, 646 (9th Cir. 2023); *Doe*, 782 F.3d at 431–32; *cf. Towery v. Schriro*, 641 F.3d 300, 308 (9th Cir. 2010); *Hart*, 97 F.4th at 654–55.

Although Catlin frames Hardin's jailhouse informant evidence as the "centerpiece" of the State's case and describes Hardin's testimony as "central" to the proceedings, those characterizations are inaccurate. The State's direct and re-direct examinations of Hardin were relatively brief— particularly when judged against the voluminous testimony presented throughout the Kern Trial. And even though the lead prosecutor stated that the jury would "have to believe" Hardin to convict Catlin, that does not transform Hardin's testimony into the centerpiece of the prosecution's case.

*Second*, as mentioned above, defense counsel did impeach Hardin on cross-examination. The jury heard about many of the benefits that he received in exchange for his testimony. And it heard about Hardin's previous history of serving as a jailhouse informant. Any additional impeachment on this point likely would have been cumulative, so the failure to present additional impeachment is unlikely to have prejudiced Catlin. *See Doe*, 782 F.3d at 431 ("The additional impeachment evidence would have been largely cumulative, albeit stronger, but the failures regarding impeachment of [the witness] are of comparatively little consequence[] . . . ."); *Matylinsky v. Budge*, 577 F.3d 1083, 1093 (9th Cir. 2009) ("While it appears that [defense counsel] could have introduced additional impeaching evidence, this extra information would not have changed the outcome of the trial because [the witness's] credibility was already squarely before the

jury.”); *Horton v. Mayle*, 408 F.3d 570, 577 (9th Cir. 2005) (“In short, [the witness’s] credibility was so undermined anyway that evidence that he also had a conviction for possession with intent to sell PCP would not have affected the outcome.”).

*Third*, the jury could have viewed Hardin’s evidence as being of limited value, which means that further impeachment of Hardin would be unlikely to affect the outcome.   To be sure, “[c]onfessions are indisputably damning evidence[.]” *Doody v. Schriro*, 548 F.3d 847, 869 (9th Cir. 2008).   But not all confessions are created equal. Here, Hardin’s testimony that Catlin said he had “killed the bitches” was cursory and largely devoid of details. Additionally, the statement was uncorroborated and unrecorded—and the state trial court instructed the jury that “[e]vidence of unrecorded oral statement[s] ought to be viewed with caution,” and that the same was true for “unrecorded oral confession[s].”   We presume that the jury followed these instructions.  *See Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016).

Moreover, as courts have recognized, confessions reported by jailhouse informants are, to a degree, inherently suspect given the obvious motive for fabrication and the difficulty of cross-examination.  *See, e.g.*, *Maxwell v. Roe*, 628 F.3d 486, 505–06 (9th Cir. 2010); *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) (en banc); *United States v. Bernal-Obeso*, 989 F.2d 331, 334–35 (9th Cir. 1993); *accord Fulcher v. Motley*, 444 F.3d 791, 810 (6th Cir. 2006); *State v. Diaz*, 25 A.3d 594, 602 (Conn. 2011).   Indeed, the state trial court instructed the jury in this case that “[t]he testimony of an in-custody informant should be viewed with caution and close scrutiny.”   It is doubtful that any additional

impeachment would have changed how the jury viewed Hardin's already-dubious evidence.

Considering the other evidence against Catlin, the substantial impeachment of Hardin that defense counsel did conduct, and the already questionable value of Hardin's evidence, the CSC reasonably could have concluded that there was no reasonable probability that Catlin would have been acquitted of the murders of Martha and Joyce if Hardin had been impeached more fulsomely. Thus, the district court did not err in rejecting Claim 26(A).

## C. Ineffective Assistance of Counsel at the Penalty Phase

### 1. Overview

Catlin next contends that the district court erred in rejecting his claims based on ineffective assistance of counsel at the penalty phase. This encompasses Claims 35(A), 35(B), 35(C), and 35(F), which raise somewhat overlapping arguments.[8]

Subclaim (A) alleges that penalty-phase defense counsel failed to do any significant work on the penalty phase, including investigating. Catlin contends that Michael Dellostritto, the counsel primarily responsible for the penalty phase, was unqualified and did not spend sufficient time investigating potential mitigating evidence. Catlin further argues that defense counsel's preparation was so lackluster that it denied him a fair trial at the penalty phase.

---

[8] For example, defense counsel's failure to present information related to Catlin's time at Camp Erwin Owen and other facilities is raised in both subclaim (B) and subclaim (C).

In subclaim (B), Catlin contends that defense counsel failed to present mitigation evidence on a variety of issues. The myriad arguments that Catlin raises in this subsection are too numerous to recount. But, in broad strokes, Catlin first faults defense counsel for not introducing evidence about Catlin's life history, including, *inter alia*, evidence about Catlin's biological parents, the "downward spiral" of the family's prospects evident during Catlin's childhood, and that Martha made Catlin dress in girl's clothing and stand by the roadside so as to suffer "public humiliation" as a child. Catlin also contends that defense counsel failed to introduce mitigation evidence regarding Catlin's sexual abuse at the hands of John Brown, a family friend.

Furthermore, Catlin argues that defense counsel failed to introduce evidence that Catlin had risk factors for, and suffered from, serious mental health issues, including brain damage. Relatedly, Catlin argues that defense counsel failed to have a proper neuropsychological examination conducted on Catlin. He points to a declaration from Dr. Natasha Khazanov, which states that Dr. Khazanov had given Catlin a neuropsychological evaluation in 2000. Based on that evaluation, Dr. Khazanov opined that Catlin suffered from brain damage and that there are "strong indicators" of possible risk factors for brain damage in Catlin's history, including Catlin's purported exposure to neurotoxins. Dr. Khazanov further stated that, in her opinion, the cognitive deficiencies caused by Catlin's brain injury were present at the time of Catlin's trials.

In subclaim (C), Catlin contends that the defense counsel failed to present mitigating evidence regarding his confinement as a youth at Camp Erwin Owen, the California Youth Authority's Youth Training School, and the California State Prison at Chino. Catlin emphasizes the poor

conditions at these institutions and argues that, had the jury known of these conditions, it would have affected their view of his character, psychological state, and crimes.

Subclaim (F) is a claim of cumulative prejudice resulting from defense counsel's ineffective assistance during the penalty phase.[9]

The AEDPA standard of review applies because these claims were originally raised in Catlin's first state habeas petition and denied on the merits. *See Cone*, 556 U.S. at 466; *see also supra* n.7. Applying this standard, the district court rejected the subclaims at issue in this appeal, reasoning that the CSC's "summary rejection of claims 35(A–C and F) was not unreasonable." In relevant part, the district court reasoned that the CSC "reasonably could find the mitigation defense presented was consistent with the primary guilt phase defense of innocence" and that presenting mental-state defenses would have been fruitless or counterproductive. The district court also determined that the CSC reasonably could have concluded that Catlin would not be prejudiced by any ineffective assistance because of the substantial aggravating evidence, including the heinous circumstances of the crimes and Catlin's previous criminal history.

## 2. Legal Standards for Ineffective Assistance at the Penalty Phase

As with Catlin's guilt-phase claim, the clearly established law to apply to claims of ineffective assistance of counsel—including claims of ineffective assistance at the penalty phase of a capital case—is *Strickland v. Washington*

---

[9] The district court did not grant a COA with respect to subclaims 35(D) and 35(E), and Catlin has not raised arguments that the COA should be expanded to cover those subclaims.

and its progeny. *Andrews*, 944 F.3d at 1107–08; *Livaditis*, 933 F.3d at 1045. As with ineffective-assistance claims relating to the guilt phase, AEDPA's deferential standard works together with *Strickland*'s deferential standard to make a habeas petitioner's path to relief "doubly difficult." *Andrews*, 944 F.3d at 1108.

At the penalty phase, "counsel has a duty to present and explain all available mitigating evidence, absent a tactical reason for not doing so." *Ross*, 29 F.4th at 1053 (quoting *Demetrulias v. Davis*, 14 F.4th 898, 913 (9th Cir. 2021)). "After all, 'fail[ing] to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase.'" *Id.* (alteration in original) (quoting *Hamilton v. Ayers*, 583 F.3d 1100, 1113–14 (9th Cir. 2009)).

"To uncover mitigating evidence, 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "Satisfying this duty requires counsel 'to conduct a thorough investigation of the defendant's background.'" *Id.* (quoting *Williams*, 529 U.S. at 396)). Importantly, in determining whether penalty-phase counsel exercised reasonable professional judgment, the key inquiry "is not whether counsel should have presented a mitigation case." *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003). "Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Id.* at 523.

To assess prejudice at the penalty phase, we "reweigh the evidence in aggravation against the totality of available mitigating evidence" and ask whether, had defense counsel

provided competent representation, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 534, 537; *see also Andrews*, 944 F.3d at 1108 ("In the context of the penalty phase of a capital case, it is enough to show 'a reasonable probability that at least one juror' would have recommended a sentence of life instead of death.'" (quoting *Wiggins*, 539 U.S. at 537)). But "[t]he likelihood of that result must be 'substantial, not just conceivable.'" *Andrews*, 944 F.3d at 1108 (quoting *Richter*, 562 U.S. at 112).

### 3. Analysis

Did the CSC unreasonably apply *Strickland* and its progeny in rejecting Catlin's claims of ineffective assistance of counsel at the penalty phase? Applying the requisite doubly deferential standard of review, we conclude that the CSC reasonably could have concluded that Catlin's claims failed both prongs of the *Strickland* test.

### a. Claim 35(A)

We begin with Claim 35(A), which alleges that defense counsel spent insufficient time on the case and failed to conduct an adequate investigation. The CSC reasonably could have concluded that defense counsel's investigation and preparation was adequate, so Catlin is not entitled to habeas relief on this basis.

We reject Catlin's assertion that the hours billed by defense counsel Michael Dellostritto demonstrate insufficient preparation. Catlin is correct that when counsel spends only a "small number of hours" in preparing for a capital case, it can be a "striking initial indication" of "deficient investigation for the penalty phase." *Avena*, 932

F.3d at 1248.[10]   But Catlin has not shown that Dellostritto spent inadequate time on this case.  In *Avena*, counsel spent fifty-three hours up through jury selection and then another forty-one hours between jury selection and the end of sentencing.  *Id.*  Here, Dellostritto billed well over a hundred hours prior to the beginning of jury selection and more thereafter.  Moreover, Dellostritto was not the sole defense counsel; Dominic Eyherabide was heavily involved in the guilt phase of the trial, and there are indications that Eyherabide was involved in the penalty phase as well.  Defense counsel also hired an experienced "mitigation investigator" to assist with the penalty phase.

We also reject Catlin's argument that the record shows that defense counsel failed to adequately investigate Catlin's background.  The CSC reasonably could have concluded that defense counsel conducted an adequate investigation. To begin, given the notoriety of Catlin's crimes—and the substantial time that passed between the murders—evidence about Catlin's background was readily available.  Numerous witnesses were interviewed by police and testified in the preliminary hearings and during the guilt phases of both trials (as well as the penalty phase of the trial in Monterey County for the death of Glenna), including Catlin's surviving wives, multiple parents-in-law, siblings-in-law, stepchildren, friends, colleagues, employees, a customer, and Catlin's mistress.

---

[10]   We doubt, though, that this could be sufficient, by itself, to show insufficient preparation and investigation.  *See Avena*, 932 F.3d at 1248 (categorizing this as an "initial indication"); *see also Bower v. Quarterman*, 497 F.3d 459, 469 (5th Cir. 2007); *United States v. Raineri*, 42 F.3d 36, 44 (1st Cir. 1994).

Turning to Catlin's specific contentions, the CSC reasonably could have concluded that defense counsel adequately investigated Catlin's early upbringing and was aware of his sexual abuse at the hands of John Brown. Catlin's counsel in the Monterey County trial for the death of Glenna hired an investigator to interview Brown, who discussed the allegations and his interactions with Catlin. Catlin seems to concede that the defense team in the Kern Trial was aware of his sexual abuse and had notes of the discussions with Brown. Moreover, Brown died before the beginning of the Kern Trial, and there is no indication in the record that Catlin (who, of course, knew of the abuse) was willing to testify about the abuse.

Likewise, the CSC reasonably could have concluded that defense counsel adequately investigated Catlin's incarceration during his youth. Catlin points only to general information about conditions in the various institutions in which he was incarcerated (as well as information of dubious relevance regarding other institutions). This is insufficient to show that defense counsel failed to uncover something regarding these institutions that would have been mitigating. General information about conditions in the California corrections system at various times is not relevant mitigating evidence because it does not bear on Catlin's character, prior record, or the circumstances of his offense. *Lockett v. Ohio*, 438 U.S. 586, 597, 604 n.12 (1978).

Finally, the CSC reasonably could have concluded that defense counsel adequately investigated Catlin's mental state and neuropsychological health. The record indicates that Catlin was examined in 1986 by at least two doctors, Drs. Leifer and Peal, who found no evidence of brain damage. Although Catlin now contends that additional testing should have been conducted, he does not suggest that

Drs. Liefer and Peal were incompetent or unqualified—or even produce their report. Defense counsel reasonably could have relied upon their views and concluded that no further investigation of Catlin's mental state and health was necessary. *See Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010).

Catlin relies heavily upon a declaration from Dr. Khazanov (who examined Catlin in 2000), which indicates disagreement with the methodologies used by Drs. Leifer and Peal and opines that Catlin had signs of brain damage. The declaration, however, is insufficient to show that defense counsel failed to conduct an adequate investigation into Catlin's mental health. A difference in medical opinion is not enough to show a failure to investigate. *See Mitchell v. United States*, 790 F.3d 881, 892–93 (9th Cir. 2015) ("At most, [a doctor's] new diagnosis of [the defendant's] mental state, eight years after-the-fact, is a 'difference in medical opinion, not a failure to investigate.'" (quoting *Crittenden*, 624 F.3d at 965)); *Crittenden*, 624 F.3d at 965–66 ("'At the end of the day,' [the defendant's] 'argument turns on a latter-day battle of experts' that is insufficient to warrant federal habeas relief.'" (quoting *Sims v. Brown*, 425 F.3d 560, 584 (9th Cir. 2005))); *cf. Ake v. Oklahoma*, 470 U.S. 68, 81 (1985) ("Psychiatry is not[] . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness[] . . . ."). That is particularly true here, where the difference in opinion arises from a new diagnosis, years after the events at issue and the original examination. *See Mitchell*, 790 F.3d at 893.

Additionally, defense counsel could consider the theory of defense in determining the scope of the pretrial investigation. *See Soffar v. Dretke*, 368 F.3d 441, 473 (5th Cir.) ("The scope of a defense counsel's pretrial

investigation necessarily follows from the decision as to what the theory of defense will be."), *amended on denial of reh'g*, 391 F.3d 703 (5th Cir. 2004) (mem.). Here, after gathering the information discussed above, defense counsel reasonably could have concluded that further investigation into the avenues suggested by Catlin, including his sexual abuse, tumultuous family life, and possible brain damage, would have been unnecessary in light of the primary theme (discussed more fulsomely below) of the penalty phase defense: that Catlin had redeeming qualities and had adjusted well to incarceration, and thus could be an asset to society who deserved life rather than death.

Catlin "was entitled to a reasonable investigation, not a perfect one." *Mitchell*, 790 F.3d at 892 (citing *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)). The CSC reasonably could have concluded that he received that here.

### b. Claim 35(B)

We next address Catlin's related argument that defense counsel failed to adequately present mitigation evidence. Specifically, Claim 35(B) alleges that defense counsel performed deficiently by failing to present mitigating evidence on a variety of topics, including (1) information about Catlin's birth parents' troubles; (2) evidence of Catlin's mistreatment by his adoptive parents, including Martha; (3) the fact that Catlin was repeatedly sexually abused by Brown; and (4) Catlin's risk factors for mental illness and brain damage. These facts, if proven, could all arguably bear on mitigation.[11] *See, e.g., Porter v.*

---

[11] We note, though, that many of the facts presented in Catlin's appellate briefing are not properly supported by citations to the record before the state habeas court—which, of course, is all we are permitted to consider, *see Pinholster*, 563 U.S. at 182–83. For example, some of the facts

*McCollum*, 558 U.S. 30, 41 (2009) (per curiam).  However, we reject Catlin's arguments and hold that the CSC reasonably could have concluded that there was no deficient performance from defense counsel's failure to present this mitigation evidence.

At the outset, it is important to acknowledge that defense counsel made a strategic decision to focus the penalty-phase defense on Catlin's positive qualities, potential to contribute to society, and lack of danger.  And strategic choices, made after a reasonable investigation, are "virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  To support the argument that Catlin had redeeming qualities and did not deserve death, defense counsel presented penalty-phase testimony from members of a family that Catlin had befriended and mentored; a woman whose child Catlin saved; a psychologist; and prison officials who testified about Catlin's exemplary behavior and contributions to the prison workforce.  This strategy accorded with Catlin's guilt-phase defense of actual innocence.  To support that defense, counsel tried to paint Catlin as having a good relationship with his family and as having considerable business acumen (and thus lacking a financial motive). Defense counsel reasonably could have declined to present mitigation evidence that would be inconsistent with this theme.  *See Mitchell*, 790 F.3d at 893 ("[The defense team] reasonably chose not to present evidence that 'would detract from, or destroy,' the chosen strategy." (quoting *Elmore v. Sinclair*, 781 F.3d 1160, 1171 (9th Cir.), *amended and superseded on denial of reh'g*, 799 F.3d 1238 (9th Cir. 2015))).

---

presented about Catlin's early history and assertions about Martha's mental illnesses are entirely unsupported.

We turn now to the specific mitigation evidence that Catlin contends should have been presented.  With respect to information about Catlin's history and early life, information about Catlin's birth parents is of little—if any—value.  Catlin was adopted as an infant, and there was no concrete evidence presented that he had any kind of genetic disorder from his birth parents.  Defense counsel did not err in declining to present such weak mitigating evidence.  *See Mitchell*, 790 F.3d at 892.

Also, defense counsel reasonably could have chosen not to introduce evidence of Catlin's troubled upbringing and his conflicts with Martha.  Highlighting these aspects of Catlin's childhood and relationship with his mother—including the allegation that Martha punished Catlin by forcing him to dress in girls' clothing—would have been entirely inconsistent with the strategy at both the guilt and penalty phases.  At the guilt phase, Catlin had emphasized his good relationship with his mother, denying that she ever threatened to cut him out of her will or dressed him in girls' clothing.  Defense counsel reasonably could have made a strategic decision not to reverse course on this point, which may well have inflamed the jury against Catlin.  Additionally, suggesting that Catlin may have been damaged by his childhood trauma would be at odds with the strategy at the penalty phase that he was no longer a danger to society.  In fact, defense counsel reasonably could have considered that this kind of evidence would backfire and remind the jury of the matricidal nature of Catlin's crime.

Defense counsel also could have reasonably decided not to present evidence that Catlin had been sexually abused by

John Brown.[12]  To be sure, "[c]hildhood sexual abuse can be powerful evidence in mitigation." *Wharton v. Chappell*, 765 F.3d 953, 977 (9th Cir. 2014); *see also Wiggins*, 539 U.S. at 534–35.  But it may well have been difficult for defense counsel to present evidence of Catlin's sexual abuse in light of Brown's death before the beginning of the Kern Trial—particularly since the record is devoid of any indication that Catlin himself would have been willing to testify on this matter.

Moreover, defense counsel reasonably could have concluded that, tactically, introduction of this evidence would not accord with the broader penalty-phase strategy of demonstrating that Catlin was not a danger to society. Introducing this evidence might well have been counterproductive—particularly since it could have opened the door to the introduction of additional damaging information, such as Catlin's dishonesty, substance abuse problems, and theft, during the years that he was abused by Brown. *See Pinholster*, 563 U.S. at 201 ("To the extent the state habeas record includes new factual allegations or evidence, much of it is of questionable mitigating value. . . . The new evidence relating to [the defendant's] family—their more serious substance abuse, mental illness, and criminal problems—is also by no means clearly mitigating, as the jury might have concluded that [the defendant] was simply beyond rehabilitation.'" (citation omitted)); *see also Bolin*, 13 F.4th at 816.

---

[12]  There is no evidentiary support for Catlin's implicit contention that his parents, including Martha, were aware that Brown was a sexual abuser when they sent Catlin to live with him.  And even if there was, defense counsel reasonably could have concluded that presentation of such evidence would be counterproductive.

We also reject Catlin's argument that defense counsel acted ineffectively by failing to present evidence that Catlin had brain damage or that he had risk factors for brain damage. The brain-damage diagnosis from Dr. Khazanov came in 2000—about twenty-four years after the murder of Joyce—and was thus of minimal value, especially because it conflicted with the previous examinations conducted by Drs. Leifer and Peal. *See Mitchell*, 790 F.3d at 892–93; *Crittenden*, 624 F.3d at 965–66; *cf. Runningeagle v. Ryan*, 825 F.3d 970, 987–88 (9th Cir. 2016) (explaining that post-hoc medical reports indicating that a defendant may have had PTSD were "not of material mitigating weight").

Moreover, defense counsel reasonably could have concluded that the jury would not be persuaded by evidence of possible brain damage. Specifically, brain-damage evidence would have rung hollow given that, by all indications, Catlin presented as intelligent and smooth-talking. Additionally, the jury had heard evidence and argument at the guilt phase regarding Catlin's business acumen. Furthermore, the idea that Catlin had brain damage would have been inconsistent with the State's portrayal of Catlin's crimes, which the jury seemingly accepted as true by rendering their guilty verdicts. The prosecutor argued that over the course of nine years, Catlin engaged in an elaborate scheme to murder his wives and adoptive mother using a highly lethal poison, while playing the role of a grieving husband, son, and stepfather. Any evidence of brain damage would have been unpersuasive given the planned and deliberate nature of Catlin's crimes. *Cf. Wong v. Belmontes*, 558 U.S. 15, 24–25 (2009) (concluding that "the cold, calculated nature" of the crime would have "served as a powerful counterpoint" to any mitigation

evidence based on the claim that the defendant was suffering from rheumatic fever affecting his cognitive abilities).

Finally, evidence of brain damage (or that Catlin had risk factors for brain damage) would be contrary to the penalty-phase strategy of emphasizing Catlin's lack of present dangerousness and the benefits to society that sparing him could provide. *See Bolin*, 13 F.4th at 817. Indeed, such evidence could have had the effect of making Catlin seem *more* dangerous, not less. *See Crittenden*, 624 F.3d at 969; *accord Gilson v. Sirmons*, 520 F.3d 1196, 1249–50 (10th Cir. 2008).

We find guidance in our decision in *Crittenden*. There, defense counsel followed the strategy of trying to humanize the defendant, emphasizing his positive qualities, and downplaying his future dangerousness. 642 F.3d at 968–69. Defense counsel decided not to emphasize the defendant's history of brain dysfunction, concluding that presenting extensive evidence on this point "would just have given the jury more 'reason for imposing the death penalty.'" *Id.* at 969. We concluded that there was no ineffective assistance of counsel, observing that counsel chose a reasonable penalty-phase strategy and could have concluded that "[t]o dwell on [the defendant's] extensive history of behavioral problems and his brain dysfunction[] . . . would have undermined this strategy." *Id.*

In sum, the CSC reasonably could have concluded that defense counsel did not act deficiently in failing to present the mitigation evidence pointed to by Catlin.

### c.   Claim 35(C)

Claim 35(C) alleges that defense counsel acted ineffectively in declining to present information about

Catlin's confinement, when he was a young man, at Camp Owen, the California Youth Authority's Youth Training Center, and the California State Prison at Chino. Catlin contends that if the jury had been informed of the horrific nature of these institutions and how they traumatized him, it could have affected the outcome of the penalty phase.

Again, the CSC reasonably could have rejected this claim. Before the state habeas court, Catlin presented only cursory evidence about the conditions at these institutions— and little (if any) of the evidence he did present related to *his* experience at these institutions. This evidence was thus of minimal value at the mitigation phase. *See Lockett*, 438 U.S. at 597, 604 n.12. Moreover, emphasizing Catlin's history of incarceration would be clearly inconsistent with the themes of the penalty-phase defense. Evidence that Catlin began a life of crime at a young age and was repeatedly incarcerated is a double-edged sword, and counsel did not act unreasonably in declining to wield it.

We may not simply second-guess defense counsel's strategy with the benefit of hindsight. Defense counsel did not act unreasonably in declining to present this evidence, and this is fatal to Claim 35(C). *See Burger v. Kemp*, 483 U.S. 776, 793–94 (1987).

### d. Prejudice (Claim 35(F))

Even if there was ineffective assistance of counsel, Catlin would be entitled to relief only if he could make a showing that counsel's deficient performance prejudiced him. But even if Catlin were able to show that defense counsel acted deficiently in preparing his penalty-phase defense, the CSC reasonably could have concluded that there was not a reasonable probability that it would convince any juror to recommend life instead of death. *See Wiggins*,

539 U.S. at 537; *Andrews*, 944 F.3d at 1108.  We undertake the prejudice inquiry by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence" and asking whether, had defense counsel provided competent representation, "there is a reasonable probability that at least one juror would have struck a different balance" in the question of life versus death.  *Wiggins*, 539 U.S. at 534, 537.

The aggravation evidence in this case is considerable. Catlin stipulated that he was convicted of a third murder— that of Glenna.  "Evidence that a capital defendant 'had committed another murder' is 'the most powerful imaginable aggravating evidence.'"  *Fauber*, 43 F.4th at 1012 (quoting *Belmontes*, 558 U.S. at 28).  And, of course, this case involved *three* murders of people close to Catlin.

Additionally, the identity of the victims is significant. Martha was the defendant's adoptive mother, and "[m]atricide provokes strong, visceral emotions, a fact used many times in ancient and classic stories, books, and movies to heighten dramatic tension and instill a sense of revulsion in the reader or viewer."  *People v. Carasi*, 44 Cal. 4th 1263, 1331–32 (2008) (Werdegar, J., concurring and dissenting) (footnotes omitted).  That Catlin killed not just his own adoptive mother but Joyce, the mother of his multiple stepchildren of various ages, and Glenna, the mother of another stepchild, further aggravates the situation.  So does the fact that Catlin had physically assaulted yet another one of his wives.

Additionally, Catlin's motive, the manner of death, and Catlin's lack of remorse could all be considered as additional aggravation evidence (or, at the least, could undercut the strength of the mitigation evidence on which Catlin now

relies).  The jury found special circumstances that Catlin had committed Martha's murder for financial gain.  *See Noguera v. Davis*, 5 F.4th 1020, 1053 (9th Cir. 2021) (upholding the consideration of the financial-gain special circumstance as an aggravating factor).  The jury could also conclude, based on the medical evidence introduced about paraquat poisoning, that Martha, Joyce, and Glenna died a slow, painful death over the course of days or weeks.  And the jury could also have concluded that, as the trial court observed, Catlin did not show remorse for his crimes, which could undercut the strength of the additional mitigating evidence on which he now relies.  *See People v. Davis*, 46 Cal. 4th 539, 621 (2009) ("[T]he presence or absence of remorse may be considered as relevant to the evaluation of mitigating evidence and to the penalty determination[] . . . .").

Thus, the aggravation evidence in this case was strong. Even if defense counsel presented the mitigation evidence relied upon by Catlin in his habeas petition, it would have been insufficient to overcome the dramatic weight of the aggravating evidence—particularly because the additional mitigating evidence would have been entirely inconsistent with the general thrust of the penalty-phase defense.  *See Bolin*, 13 F.4th at 817 ("[T]he prejudicial impact of not presenting certain potentially mitigating evidence is lessened if that evidence would 'undercut' a mitigation theory that counsel did present." (quoting *Pinholster*, 563 U.S. at 202)).

Additionally, the penalty-phase jury did not debate for long.  In total, deliberation lasted less than two-and-a-half hours.  That the jury did not struggle in coming to a decision at the penalty phase suggests that the failure to present additional mitigation evidence did not prejudice Catlin.  *See Mayfield v. Woodford*, 270 F.3d 915, 926 (9th Cir. 2001) (en

banc); *cf. Stankewitz v. Wong*, 698 F.3d 1163, 1175 (9th Cir. 2012) ("Another indicator of prejudice[] . . . is the difficult time the jury had reaching a unanimous verdict on death.").

Accordingly, weighing this aggravating evidence against the mitigating evidence adduced at trial and in Catlin's habeas proceedings, the CSC reasonably could have concluded that there was no reasonable probability that at least one juror would have voted for life if defense counsel had presented the additional mitigating evidence relied upon by Catlin.   *See Wiggins*, 539 U.S. at 537; *see also Runningeagle*, 825 F.3d at 988.  Thus, the CSC reasonably could have concluded that Catlin failed to show the prejudice required by *Strickland*.

In arguing against this conclusion, Catlin relies on juror declarations stating that the jurors wanted to hear about what could have "drive[n]" Catlin to commit the crimes.  Even assuming that these declarations can be considered, *but see* Fed. R. Evid. 606(b), we are unpersuaded that they make a difference.   The evidence Catlin now offers would not provide the jury with an explanation for Catlin's calculated, planned criminal behavior and would not lessen his moral culpability in the eyes of the jurors.

### 4.  Conclusion

Under the deferential AEDPA standard of review, Catlin is not entitled to habeas relief based on ineffective assistance of counsel at the penalty phase.  The CSC reasonably could have concluded that Catlin failed under *both* prongs of the *Strickland* test.  We thus affirm the district court's denial of Claim 35, including all relevant subclaims.

## II. Uncertified Claim

Next, we turn to Claim 23 of Catlin's § 2254 petition. The district court did not grant a COA on this claim, and we will treat Catlin's briefing on the subject "as a request to expand the scope of the certificate of appealability." *Robertson*, 849 F.3d at 1187 (quoting *Delgadillo*, 527 F.3d at 930). To be entitled to expand his COA, Catlin "'must demonstrate that reasonable jurists would find the district court's assessment of [Claim 23] debatable or wrong' in light of AEDPA." *Id.* (citations omitted) (quoting *Miller-El*, 537 U.S. at 336, 338).

Catlin has failed to surmount this burden because he cannot show that reasonable jurists could debate the district court's resolution of Claim 23. Accordingly, we decline to expand the certificate of appealability to encompass this claim, and we dismiss this aspect of Catlin's appeal for lack of jurisdiction.

### A. Overview of Claim 23

Like several of Catlin's other claims, Claim 23 relates to Hardin, the jailhouse informant who testified, *inter alia*, that Catlin admitted that he had "killed the bitches." Claim 23 comprises multiple interrelated claims. *First*, Catlin contends that the State violated its duties under *Brady v. Maryland* because it did not disclose the full extent of the benefits received by Hardin—including the dropping or reducing of various specific charges and the receipt of meals and hotel rooms from law enforcement—in exchange for his testimony against Catlin. *Second*, Catlin contends that the prosecution knew of Hardin's mental health problems and should have disclosed information related to those problems pursuant to *Brady*. *Third*, Catlin contends that the lead prosecutor, Deputy Attorney General Witt, and Fresno

County Sheriff's Deputy Johansen knowingly presented false testimony and evidence and thus violated their due-process obligations under *Napue v. Illinois*, 360 U.S. 264 (1959).

Claim 23 was originally raised in Catlin's first state habeas petition, and the CSC denied it on the merits. In Catlin's second state habeas petition, the CSC rejected the claim in part because it had been raised in the first petition. As such, Claim 23 must be viewed through the lens of the deferential AEDPA standard. *See Cone*, 556 U.S. at 466.

Applying this standard of review, the district court rejected the *Brady* and *Napue* claims presented in Claim 23.[13]　As to Catlin's *Brady* claims, the district court determined that the CSC reasonably could have concluded that Catlin had not presented sufficient evidence to show that the State actually failed to disclose exculpatory or impeachment evidence, such as Hardin having received additional benefits in exchange for his testimony. The district court further determined that the CSC reasonably could have concluded that there was no *Brady* violation with respect to the information about Hardin's mental health because Catlin did not adduce evidence showing that the

---

[13] The district court also concluded that "[a]spects of Petitioner's claim 23 not adjudicated by the state supreme court fail on *de novo* review" for the same reasons that they failed AEDPA review. It appears, however, that the district court essentially treated all of Claim 23 as having been raised in Catlin's first state habeas petition and rejected on the merits by the CSC. Based on our review of the portions of Catlin's first state habeas petition in the record, we agree. And Catlin has not explained why the district court's conclusion on this point was wrong or pointed to any aspects of Claim 23 that were not raised in his first state habeas petition. We accordingly will treat all of Claim 23 as having been raised in the first state habeas petition and rejected on the merits by the CSC.

State possessed that information. As to Catlin's *Napue* claims based on the false presentation of testimony, the district court concluded that the record suggested simple confusion and inconsistencies that did not rise to the level of the knowing presentation of false testimony.

Finally, the district court concluded that even if Catlin could show that the State had failed to disclose exculpatory evidence or had presented false testimony, the CSC reasonably could find that there was no risk of prejudice to Catlin from these errors. In other words, the district court reasoned that the CSC "could find no reasonable probability that the allegedly suppressed evidence, considered cumulatively, would have produced a different result at trial, and that there was no reasonable likelihood that the allegedly false testimony could have affected the judgment of the jury." (Citations omitted).

## B. Catlin's *Napue* Claim

### 1. Legal Standards for a *Napue* Claim

Longstanding Supreme Court precedent makes clear that convictions violate due process if they are the result of the knowing presentation of perjured testimony. *See Dickey*, 69 F.4th at 636 (citing *Mooney v. Holohan*, 294 U.S. 103, 112–13 (1935) (per curiam)). The key case relied upon by Catlin is *Napue*. "In *Napue*, the Supreme Court held 'that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (quoting *Napue*, 360 U.S. at 269); *see also Dickey*, 69 F.4th at 636 ("[T]he Supreme Court established that a conviction is invalid if the State is aware of a material falsity and fails to correct it, regardless of whether the State intentionally solicited the false evidence or

testimony." (citing *Napue*, 360 U.S. at 269–70)).    This principle applies even when "the false testimony goes only" to witness credibility.  *Dickey*, 69 F.4th at 636 (quoting *Napue*, 360 U.S. at 269); *see also Hayes v. Ayers*, 632 F.3d 500, 520 (9th Cir. 2011).

To prevail on his *Napue* claim, Catlin must show that "(1) [the] testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony is false, and (3) . . . the false testimony was material." *Dickey*, 69 F.4th at 636 (omission in original) (quoting *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc)).

Under the first requirement, the presented testimony must have actually been false.  *See id.*  Testimony that is simply inconsistent or equivocal may not rise to the requisite level of actual falsity.  *See Hayes v. Ayers*, 632 F.3d at 520–21; *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) ("Discrepancies in the testimony about the details . . . could as easily flow from errors in recollection as from lies."), *overruled on other grounds by Valerio v. Crawford*, 306 F.3d 742, 764 (9th Cir. 2002) (en banc); *cf. United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) ("[T]he evidence . . . does not establish that the government knew, or should have known, that [the witnesses'] testimony was false.  At most, two conflicting versions of the incident were presented to the jury." (citation omitted)).

Additionally, "[o]n a *Napue* claim, the existence of constitutional error does not alone justify relief." *Clements v. Madden*, 112 F.4th 792, 802 (9th Cir. 2024).  The false testimony must be material.  *Id.*  The Supreme Court has "explained that the materiality analysis for a *Napue* violation requires that a conviction 'must be set aside if there is *any*

*reasonable likelihood* that the false testimony *could have* affected the judgment of the jury.'" *Dickey*, 69 F.4th at 636 (quoting *United States v. Agurs*, 427 U.S. 97, 103–04 (1976)).  The materiality inquiry is "focused on the potential impact of the false testimony." *Clements*, 112 F.4th at 804.  But "a *Napue* claim fails if, absent the false testimony or evidence, the petitioner still 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Panah*, 935 F.3d at 664 (quoting *Brown*, 399 F.3d at 984).

### 2.  Analysis

No reasonable jurist could debate the district court's resolution of the *Napue* claims.  *First*, no reasonable jurist could debate the district court's determination that the CSC reasonably could have concluded that Catlin failed to establish the first two elements of a *Napue* claim—that the testimony presented was false and that the State knew or should have known that the testimony was false.  *See Clements*, 112 F.4th at 801.

Catlin first argues that one of the prosecution witnesses, Fresno County Sheriff's Deputy Johansen, presented false testimony when, *inter alia*, he stated that he did not intercede on Hardin's behalf in Fresno County cases except for specific spousal abuse charges.  Catlin contends that Deputy Johansen interceded more than he represented.  However, the record supports a conclusion that there was, at most, inconsistent testimony.  Hardin had a voluminous criminal history and had faced a variety of charges in multiple jurisdictions.  It is not clear that there was a knowing presentation of false testimony or that the State knew or should have known that Johansen's testimony was false.  Catlin's argument that Hardin presented knowingly false testimony that went uncorrected fails for the same reason.

*Cf. Clements*, 112 F.4th at 801–02 (finding a *Napue* violation where it was "quite clear" that an informant received benefits from the prosecution and lied in saying otherwise); *Phillips v. Ornoski*, 673 F.3d 1168, 1182 (9th Cir. 2012) (observing that the state went to "elaborate lengths" to suggest that no benefit was received in exchange for an informant's testimony).  No reasonable jurist could debate the district court's resolution of this issue.[14]

Catlin also contends that the lead prosecutor, Witt, provided "false and misleading" answers regarding the scope of the benefits received by Hardin.  To the extent that Catlin contends that this rises to the level of a *Napue* claim, we are unconvinced.  The inconsistencies that Catlin has pointed to are minor matters, easily explained by the complexity of the various charges faced by Hardin.

*Second*, as the district court concluded, even if Catlin could show that the State knowingly presented false testimony, that testimony would simply not be material.  It is important to situate the allegedly false testimony in the full context of the trial: it is about the existence of a few specific benefits received by Hardin, a jailhouse informant.  But this is not a case where the fact that Hardin received benefits was withheld from the jury or only other, unrelated impeachment evidence was presented.  *Cf. Clements*, 112 F.4th at 804–05.  To the contrary, the fact that Hardin received substantial benefits in exchange for his testimony against Catlin,

---

[14] To the extent that Catlin's claim is based on an argument that Deputy Johansen knew that Hardin's testimony was false (or that Johansen knew that he or Hardin were testifying falsely), we note also that "it is *not* clearly established that a police officer's knowledge of false testimony may be attributed to the prosecution under *Napue*."  *Reis-Campos v. Biter*, 832 F.3d 968, 977 (9th Cir. 2016); *see also Browning v. Baker*, 875 F.3d 444, 461 (9th Cir. 2017).

including the dropping or reducing of charges, was squarely before the jury. The benefits received by Hardin and the possible resulting bias comprised the majority of the questioning of Hardin. All that the allegedly false testimony relates to is the specific contours of which charges were dismissed or dropped in exchange for Hardin's testimony. It is hard to see how this could be characterized as material under any standard.

The lack of materiality is underscored by the fact that Hardin's testimony was not crucial to the State's case. As we discussed above with respect to Claim 26(A), there was *substantial* evidence of Catlin's guilt. And when there is substantial evidence of guilt, false testimony bearing on the credibility of a single witness is less likely to be material. *See Phillips*, 673 F.3d at 1190–91; *Sivak v. Hardison*, 658 F.3d 898, 913–14 (9th Cir. 2011); *Panah*, 935 F.3d at 664–66.

Considering these realities, no reasonable jurist could debate that the CSC reasonably could have concluded that, notwithstanding the allegedly false testimony, Catlin "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Panah*, 935 F.3d at 664 (quoting *Brown*, 399 F.3d at 984).

## C. Catlin's *Brady* Claim Based on the Benefits Received by Hardin

### 1. Legal Standards for a *Brady* Claim

For Catlin's claims based on the State's failure to disclose exculpatory or impeachment evidence, the clearly established federal law at issue is *Brady* and its progeny. *See Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002); *cf. Hooper v. Shinn*, 985 F.3d 594, 615–16 (9th Cir. 2021).

"*Brady* established the three elements of a due process violation based on the suppression of evidence: (1) the evidence is favorable to the accused, (2) the prosecution suppressed the evidence, and (3) the evidence is 'material.'" *Hooper*, 985 F.3d at 616 (quoting *Brady*, 373 U.S. at 87). "'Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes,' including exculpatory and impeachment evidence." *Ochoa v. Davis* (*Ochoa I*), 16 F.4th 1314, 1326–27 (9th Cir. 2021) (citations omitted) (quoting *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013)).

The materiality requirement for *Brady* is also called the "prejudice" requirement. *See id.* at 1327 (describing these terms as "interchangeable[]"). "Evidence is prejudicial or material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different.'" *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011) (footnote omitted) (emphasis added) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "There is a 'reasonable probability' of prejudice when suppression of evidence 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "But 'a reasonable probability' may be found 'even where the remaining evidence would have been sufficient to convict the defendant.'" *Id.* (quoting *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008)). Notably, the standard for materiality under *Brady* is distinct from the standard for materiality under *Napue*; it is more challenging to show materiality in the *Brady* context. *See Phillips*, 673 F.3d at 1188–90.

In sum, "[t]he question is not whether the defendant would more likely than not have received a different verdict

with the evidence, but whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hart*, 97 F.4th at 654 (second alteration in original) (quoting *Ochoa I*, 16 F.4th at 1327).

## 2. Analysis

Catlin points to documents purportedly showing that Hardin received specific benefits in exchange for his testimony that were not disclosed to Catlin, such as having a disturbing-the-peace charge dropped. Many of these documents relate to benefits that Hardin allegedly received between the time he struck a deal to testify and the actual trial of Catlin. We conclude that no reasonable jurist could debate the district court's rejection of Claim 23 because it is clear beyond peradventure that, even assuming that this evidence is favorable and the State suppressed it—which we do not decide[15]—the failure to disclose the evidence was not material. *See id.* ("If we determine that evidence is not

---

[15] We pause to observe that some of the evidence that Catlin relies upon in arguing that there was a *Brady* violation is quite speculative. For example, Catlin contends that a 1988 charge for carrying a loaded weapon was dismissed in exchange for Hardin's testimony. And he argues that law enforcement failed to enforce a restraining order against Hardin. But Catlin relies entirely upon speculation as support for his conclusion that these were benefits for Hardin's testimony against Catlin. Such speculation is likely insufficient to support a *Brady* claim. *See Runningeagle v. Ryan*, 686 F.3d 758, 769–70 (9th Cir. 2012); *see also Gentry v. Sinclair*, 705 F.3d 884, 902 (9th Cir. 2013) (observing that there was no "actual evidence" of a deal for an informant's testimony). However, for purposes of assessing whether Catlin is entitled to a COA, we assume that Catlin has shown that reasonable jurists could debate the district court's conclusion that Catlin had failed to satisfy the first and second prongs of the *Brady* test.

material under *Brady*, we need not address the other elements of a *Brady* claim.").

Our discussion of materiality tracks, but is not governed by, our discussion of materiality with respect to Claim 26(A)[16] and the *Napue* component of Claim 23. Again, all Catlin points to is evidence suggesting that there were additional undisclosed benefits that Hardin received in exchange for his testimony. But Hardin's "credibility had already been seriously challenged during cross-examination at trial," *Rhoades v. Henry*, 598 F.3d 495, 504 (9th Cir. 2010), using evidence that Hardin received benefits in exchange for his testimony. The defense's impeachment of Hardin based on the benefits he received from law enforcement, was, in fact, the focus of cross-examination. Evidence of additional benefits that Hardin may have received (including information related to additional charges being dismissed or fringe benefits such as meals) would have been cumulative of other impeachment evidence of the same type that was already before the jury. Catlin's proffer is insufficient to establish materiality under *Brady*. *See id.*; *Kohring*, 637 F.3d at 908; *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006); *Williams v. Woodford*, 384 F.3d 567, 598– 99 (9th Cir. 2004); *cf. Horton*, 408 F.3d at 579–80 (concluding that the failure to disclose that an informant received leniency in exchange for testimony was material because it was "powerful and unique" and a "different kind of impeachment evidence" from that already presented).

In *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005), we considered similar facts to those present here and

---

[16] The materiality/prejudice inquiries for ineffective assistance of counsel and *Brady* are identical. *See Hein v. Sullivan*, 601 F.3d 897, 919 (9th Cir. 2010).

concluded that "[e]ven if the prosecution did hide one of the benefits it gave [the witness], a deal involving the residential burglary charge would have very nearly replicated evidence already admitted that showed [the witness] received significant benefits for his testimony." *Id.* We reasoned that "[a]dding the dismissal of one additional charge to that list of already substantial benefits would not add to the impeachment value of the evidence." *Id.* That reasoning applies here, even though Catlin claims that multiple dismissals were undisclosed. Similarly, in *Hooper*, we concluded that testimony that a witness received undisclosed benefits was not material when that witness was "vigorously impeached." 985 F.3d at 617–18.

Moreover, as we have already indicated, there was substantial evidence of Catlin's guilt even leaving aside Hardin's testimony, which was brief and—as the jury was instructed—already suspect insofar as it involved an uncorroborated confession to a jailhouse informant. The fact that there is substantial other evidence of Catlin's guilt and that Hardin's testimony was not "central" to the State's case, *see Horton*, 408 F.3d at 578–79, makes it hard to see how additional (cumulative) impeachment evidence would have impacted the jury's decision. *See Hart*, 97 F.4th at 655; *Morris*, 447 F.3d at 741.

Thus, no reasonable jurist could debate that the CSC reasonably could have concluded that the non-disclosure at issue in this case was not material under *Brady*.[17]

---

[17] That remains true even if we consider the evidence purportedly suppressed in violation of *Brady* and the purported *Napue* violations together. *See Phillips*, 673 F.3d at 1189 (explaining that, when *Napue* claims and *Brady* claims are both raised, materiality is analyzed

## D. Catlin's *Brady* Claims Based on Hardin's Mental Health

Claim 23 also contains an assertion that the State violated its *Brady* obligations by failing to disclose information related to Hardin's mental health. We need not linger long over this claim. Catlin's assertion that Hardin had mental health problems relies entirely on declarations from Hardin's family members, and he does not show that the State actually possessed this information. Thus, there could be no suppression of the evidence. No reasonable jurist could debate the district court's rejection of this claim.

## E. Conclusion

In sum, no reasonable jurist could debate the district court's resolution of Claim 23 or any of its facets. We accordingly decline to expand the COA and thus dismiss for lack of jurisdiction the portion of Catlin's appeal challenging the district court's disposition of Claim 23.[18]

---

collectively); *Sivak*, 658 F.3d at 914 ("We reach the same result under *Brady* and our collective *Napue-Brady* analysis.").

[18] Catlin's brief purports to challenge the denial of his request for an evidentiary hearing, primarily because such a hearing would have permitted him to further develop Claim 23. Catlin's argument is cursory, though, and it is not clear that he has squarely challenged the district court's ruling on this point. But even if we were to reach the merits of this argument, the district court did not abuse its discretion in denying Catlin's request for an evidentiary hearing. *See Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). When, as here, the state court's decision does not violate AEDPA, the federal court is limited in most circumstances to the record before the state court. *See Shinn v. Ramirez*, 596 U.S. 366, 378 (2022); *Pinholster*, 563 U.S. at 183 ("[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" (quoting *Schiro v. Landrigan*, 550 U.S. 465, 474 (2007))).

## **CONCLUSION**

The jury found Steven Catlin guilty of murdering his fourth wife and his adoptive mother with poison. He stipulated that he had previously been convicted of murdering his fifth wife. At the penalty phase of Catlin's capital trial, the jury sentenced him to death.

In his § 2254 federal habeas petition, Catlin lodges a variety of challenges to the guilty verdict and the death sentence. But when we analyze Catlin's challenge under the deferential standard of review dictated by AEDPA, it is clear that Catlin is not entitled to habeas relief. The California Supreme Court reasonably could have rejected (1) Catlin's arguments in Claims 10 and 11 based on the existence of an *ex parte* communication between a trial judge and a juror; (2) Catlin's argument in Claim 26(A) that he received ineffective assistance of counsel at the guilt phase; and (3) Catlin's argument in various subsections of Claim 35 that he received ineffective assistance of counsel at the penalty phase. Additionally, we decline to expand the certificate of appealability to encompass Catlin's challenges in Claim 23 based on the State's alleged presentation of false testimony and failure to disclose exculpatory evidence.

**AFFIRMED.**